## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

NICHOLAS COLLIAS, MARK DALLOO,
KENNETH DUFF, RAMON HANA,
JOSEPH HISSOM-GALANTY,
RITA KING, NICOLE LEONE,
BEATRIX MUREL, KEVIN POLLACK,        Case No.
TODD MILO RUNYON, MATTIA SAFADI,
SUSIE STOKES, DENISE TERRY,        Hon.
AUDONTE WALKER, NIHAD ZORA,

       Plaintiffs,

v.

MOTORCITY CASINO,

       Defendants.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
Kara F. Krause (P85487)
HURWITZ LAW PLLC
Attorneys for Plaintiff
617 Detroit Street, Suite 125
Ann Arbor, MI 48103
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com
kara@hurwitzlaw.com

---

## **COMPLAINT AND JURY DEMAND**

NOW COME Plaintiffs Nicholas Collias, Mark Dalloo, Kenneth Duff, Ramon

Hana, Joseph Hissom-Galanty, Rita King, Nicole Leone, Beatrix Murel, Kevin

Pollack, Todd Milo Runyon, Mattia Safadi, Susie Stokes, Denise Terry, Audonte

Walker, and Nihad Zora ("Plaintiffs"), by and through the undersigned attorneys, and state the following:

## INTRODUCTION

1.     MotorCity Casino ("Defendant") deliberately flouted Title VII of the Civil Rights Act of 1964 ("Title VII") and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") by blanketly denying religious exemptions from its mandatory COVID-19 policy based on a purported "undue hardship."  There was no basis for hardship, however, because Defendant allowed its union employees, customers and vendors to enter premises without any vaccine requirement.  Defendant then lifted its vaccine mandate within months of terminating Plaintiffs and invited the former employees to reapply for employment—which further undermines Defendant's claim that unvaccinated employees pose an undue hardship.

## PARTIES, JURISDICTION, AND VENUE

2.     Nicholas Collias resides in Richmond, Michigan.

3.     Mark Dalloo resides in Macomb, Michigan.

4.     Kenneth Duff resides in Grosse Pointe Farms, Michigan.

5.     Ramon Hana resides in Macomb, Michigan.

6.     Joseph Hissom-Galanty resides in Plymouth, Michigan.

7.     Rita King resides in Sterling Heights, Michigan.

8.     Nicole Leone resides in Chesterfield, Michigan.

9.     Beatrix Murel resides in Hazel Park, Michigan.

10.    Kevin Pollack resides in Dearborn, Michigan.

11.    Todd Milo Runyon resides in Southgate, Michigan.

12.    Mattia Safadi resides in New Hudson, Michigan.

13.    Susie Stokes resides in Detroit, Michigan.

14.    Denise Terry resides in Canton, Michigan.

15.    Nihad Zora resides in Sterling Heights, Michigan.

16.    Audonte Walker resides in Detroit, Michigan

17.    Defendant MotorCity Casino Hotel is a domestic for-profit corporation.

18.    The Eastern District of Michigan has jurisdiction over the Title VII of the Civil Rights Act of 1964 ("Title VII") claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the Elliott-Larsen Civil Rights Act ("ELCRA") claims pursuant to 28 U.S.C. § 1367.

19.    Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b)(1) because it is the judicial district in which Defendant operates its businesses.

20.    Plaintiffs have all received a Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission ("EEOC") within the past 90 days.

## FACTUAL ALLEGATIONS

### Defendant's Mandatory Vaccine Policy

21.    On October 6, 2021, Defendants announced a COVID-19 vaccine mandate for all non-union employees and elicited accommodation requests in a letter from Chief Financial Officer Bruce Dall.

22.    Mr. Dall stated:

Time is of the essence to protect ourselves, our loved ones and our coworkers. Unfortunately, based on information we have, not nearly enough associates have opted to get the vaccine. We are implementing a mandatory COVID-19 vaccination policy for all current non-union associates, subject to reasonable accommodations as required by applicable law. Vaccination is now also required for all new hires at MotorCity. We've also been working with our unions towards our goal of implementing a mandatory vaccination policy for all current union associates.

23.    Mr. Dall concluded his letter by proclaiming, "I've been vaccinated and encouraged everyone around me to get the vaccine, including my family. I personally consider it a privilege but, more importantly, I feel it's my duty to protect my family, my coworkers, and the rest of those around me."

24.    Defendant welcomes unvaccinated patrons onto premises and does not require vaccination from its union employees or vendors.

25.    Defendant's policy dictates, "[a]ny Non-Union Employee who has not received the First Shot and provided to [the Company], prior to October 22, his/her Proof of Vaccination reflecting it will be terminated as of that dated[.]"

4

26.     Defendant's policy also states, "Non-Union Employees[s] must make the request at least seven (7) days prior to the date on which such termination would occur [October 22, 2021]."

27.     Less than ten days from the vaccine announcement, Plaintiff's, unlike their union-counterparts, had until October 15, 2021 to file religious and/or medical accommodations.

**Plaintiff's Religious Accommodation Requests**

28.     On October 21, 2021, Plaintiff Stokes emailed Benefits Manager Winifred Richardson the following: "[a]t this point I have provided documentation that I did have COVID-19 and was treated in the hospital for it on September 9, 2021. I have called my doctor's office to ask for a letter stating I cannot be vaccinated for 90 days and still waiting on a return call. I have done all that I can do. I don't want to cause harm to myself at this time because it is very stressful at this time."

29.     Ms. Richardson replied, "[i]f we don't have anything that can substantiate your reason for not getting the vaccine, you will be required to have your first shot by 4 [p.m.] tomorrow."

30.     Plaintiff Stokes subsequently attempted to file a religious accommodation with Ms. Richardson, but Ms. Richardson rejected the religious accommodation request.

5

31.    Ms. Richardson asserted that Defendant's self-imposed, arbitrary "deadline for submitting that document was last Friday [October 15, 2021], [she] would not accept [the request] at [that] time."

32.    The Equal Employment Opportunity Commission has publicly taken the position that "[a]n arbitrary deadline does not protect an employer from its obligation to provide a religious accommodation. An employer must consider, at the time it receives a request for a religious accommodation, whether the request can be granted without undue burden."

33.    Plaintiff Stokes's supervisor, Director of Cage Operations Joel Doehring, implored "is there anything we can say or do to convince you to get the vaccine" before terminating her on October 22, 2021.

34.    Plaintiff Collias and Plaintiff Leone's terminations further demonstrate Defendant's discriminatory animus of employees who espoused sincerely held religious beliefs.

35.    Prior to Defendant's COVID-19 vaccine mandate, management knew that Plaintiff Collias is a devout Greek Orthodox Christian, as he would annually request days off to observe Greek Orthodox Holy Week and Easter. They were also aware that Plaintiff's Collias' beliefs precluded vaccination.

36.    Director of Slots Starrice Hunt advised Plaintiff Collias to carefully research and prepare a medical accommodation request.

37.     Similarly, Plaintiff Leone's manager knew she was devoutly religious and opposed the vaccine since she suffered a debilitating injury as a vaccine side effect during childhood.

38.     However, both Plaintiff's were terminated on October 22, 2021.

39.     Plaintiff Stokes, Plaintiff Collias, and Plaintiff Leone knowingly did not submit religious accommodation requests because they were told doing so would not be successful.

40.     "Forcing individuals to choose between their faith and their livelihood imposes an obvious and substantial burden on religion . . . vaccine mandates . . . presents a crisis of conscience for many people of faith.  It forces them to choose between the two most profound obligations they will ever assume—holding true to their religious commitments and feeding and housing their children.  To many, this is the most horrifying of Hobson's choices." *Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 841 (5th Cir. 2021).

41.     The remaining Plaintiff's submitted religious accommodation requests and were uniformly denied.

42.     Each remaining Plaintiff was required to fill out a Request for Accommodation Form.

43.     In response to Question No. 1on the form to "please describe the conflict between such religious belief, practice, or observance and the provision(s)

of the mandatory COVID-19 vaccination policy, Plaintiff Pollack answered, in

relevant part:

> The COVID-19 vaccine delivery system causes changes in the human body affecting my God given immune system, and since the Holy Spirit resides within my body, this is defiling the integrity of my body. For I believe, as written in 1 Corinthians 3:17, "If anyone destroys the temple of God, God will destroy that person; for the temple of God is holy, and that is what you are."

> COVID-19 vaccines, using abortion procured parts and material for medical research and development, and any outcomes or products derived from the use of said materials, are in conflict with God's Word and Law, specifically the murder of innocent life (Proverbs 6:16-17). Any medical outcome based on these circumstances I believe to be unclean, as well as unlawful to God, and therefore, unfit to be in my body. As I believe in God's Word, commandments and laws, I am called to obey them and not participate in any action that is against God. As it is written in Ecclesiastes 12:13, "The conclusion, when everything has been heard, is: fear God and keep His commandments, because this applies to every person."

> In Summary, the obligation to receive the vaccine is in conflict with my closely, sincerely held, and lawfully protected religious beliefs which dictate that I cannot consent to receiving the mandatory COVID-19 vaccine, in any way, into my body. I believe receiving this vaccine wholly violates my closely held religious beliefs, and in doing so, jeopardized my relationship with God and the Holy Spirit within me. Further, I believe that only by following my conscience am I following the Word of God. By not following my conscience, it places me in direct conflict with God by defying Him and His laws.

44.     When Plaintiff Runyon was asked to "please identify the religious

belief, practice, or observance that [caused him] to seek the accommodation

identified in response to Question No. 1 and how long [he has] held/subscribed to

that belief, practice, or observation," he answered, in relevant part:

Conscience is that upon which all things hinge. My soul is my responsibility to God. A violation of my conscience is an injury to my soul, my mind (reason), my heart, my spirit, my will, and my body; it hardens my heart and soul, dissipates the focus of my mind (reason), my will, and affects my sensitivity to the Spirit of God. Speaking from my own religious experience, to act against it deadens my conscious contact with God. Conscience, I believe to be an expression of the Holy Spirit as it relates to best of my knowledge. Given a situation, decision, idea, or course of action, it is my conscience which guides me in truth and life. I believe that conscience grows as my relationship to God and as my knowledge grows, moving away from the taints of egoic self-interests and social pressures. To live and act in accordance with conscience is foundation of my life, it means for me to live and act in accordance with the Spirit of God to the best of my understanding, it is what is involved in walking with God... To force anyone to act against their conscience (which I believe is cannot be separated from the Holy Spirit) is, in my belief, and assault on the spiritual integrity of people's souls, affecting their sensitivity to movements of God in their hearts, regardless of their conscious ability to formulate in their mind (reason)s a religious belief. Religious faith is built upon the heart and the mind (reason).

45.     When Plaintiff Duff responded to the question, "Please identify the religious belief, practice, or observance that is causing you to seek the accommodation identified ... and how long you have held/subscribed to that belief, practice, or observation," he stated, "My religious beliefs as a Christian do not allow me to receive a COVID-19 vaccine. God created me with an immune system and I cannot alter his design. Gods words tell me: 1 Cor 619 "Do you not know that your bodies are Temples of the Holy Spirit, who is in you, whom you have received from God?"

9

46.     When asked to if the religious belief, practice, or observance is based on an organized religious faith, Plaintiff Duff stated, "No it is not. But when our Governor closed all the Churches in our state I decided to look for support for my beliefs. I went online and found True Hope Ministry. They help me to focus on my beliefs which give me hope and inspiration to get through the lock-down as I was worried about the future."

47.     Plaintiff Duff attached a letter from True Hope Ministry to his religious accommodation request, which affirmed his sincerely held religious beliefs and how they preclude him from receiving the COVID-19 vaccine.

48.     Plaintiff King sent a letter to the Company, stating, in relevant part:

Although the Catholic Church does not oppose individuals from freely receiving the vaccine and encourages people to safeguard personal and public health, the Church opposes forced vaccination when the vaccine does not align with their moral conscience.

Official Church teachings that demonstrate the religious basis on which a Catholic may refuse certain vaccines include, but are not limited, to the following:

The free and informed judgement made by a competent adult patient concerning the use or withdrawal of life-sustaining procedures should always be respected and normally complied with, unless it is contrary to Catholic moral teaching.

Concerning vaccines that are created using human cell lines derived from abortion, there is a grave responsibility to use alternative vaccines

and to make a conscientious objection with regard to those which have moral problems.

Practical reason makes evident that vaccination is not, as a rule, a moral obligation and that, therefore, it must be voluntary.

49.    Rather than relying on these Plaintiff's submissions, Defendant imposed a novel requirement that employees submit to an interrogation conducted by the Company's Human Resources Department, led by Vice President of Human Resources David Turner.

50.    Employees were not told questions ahead of time, nor did Defendant explain their legal obligations for religious or medical accommodations. Employees were also not allowed to have legal representation.

51.    The following questions were typically asked:

    a.    Is your religious belief temporary or indefinite?

    b.    Do you have any science-based concerns about the vaccine?

    c.    What is the religious nature of your concerns about the vaccine?

    d.    Do you have any holidays that you follow or observe?

    e.    Have you been affiliated with other religions in the past?

    f.    Have you ever had any vaccinations?

    g.    Why are you requesting an accommodation to the vaccine?

    h.    Do you have any political concerns about the vaccine?

    i.    What religious belief do you follow?

j.      How often do you go to church?

k.      What stance have your religious leaders taken on the COVID-19 vaccine?

l.      How does accepting the COVID-19 vaccine conflict with your beliefs?

m.      Do your religious views prohibit you from receiving any medical treatment?

n.      Would you take prescriptive medication?

o.      If you get cancer, will you go through chemotherapy?

p.      Do you take over the counter medication?

q.      How long have you held your religious belief?

r.      Is there anything else you don't do because of your religion?

52.     Defendant challenged the truth of Plaintiffs' religious beliefs during interviews.

53.     During at least one interview, Mr. Turner told a Catholic employee who filed a religious accommodation that "the Pope doesn't agree with you."

54.     When Mr. Turner interviewed Plaintiff Runyon on October 19, 2021, he questioned where Plaintiff Runyon had used a list of over-the-counter medications, including Aspirin, Advil, Tylenol, Pepto Bismol, Motrin, Tums, Maalox, Benadryl, Sudafed, Claritin, or Robitussin. He then claimed that each medication "utilized fetal stem cell line tissue in their development."

55.    After the interview concluded, Plaintiff Runyon emailed Mr. Turner the

following:

I am concerned about that product list, connected with fetal tissue, you gave in our meeting today and wish to research them. I was very surprised by the list. I had no idea. Please forward this to me as soon as you are able. I am hesitant regarding them until I know more.

While at lunch I learned that Aspirin was in use going back to ancient times. It was first synthesized in 1897, which is well before the use of fetal cells in the laboratory. So it is safe to conclude that the use of fetal cells played no part in the development of Aspirin, nor would its manufacture be dependent on it. The misuse of the Aspirin, by testing it using fetal cells does not bear on the morality of using the product, in and of itself, for me. The misuse of a product with fetal testing is very different than a product which is built upon fetal tissue. To be clear, my issues have been focused on the "development or manufacture of the product." Perhaps a more clear way of stating the point of conflict for me is using products whose origins are dependent upon fetal cells. This is an important distinction.

56.    Mr. Turner merely replied, "[a]s I stated, in the interview, I will provide

you with the very list I read from, when I respond to your request for

accommodation." The next day, October 20, 2021, Mr. Turner emailed Plaintiff

Runyon and stated that the medications listed during the interview "have utilized

fetal stem cell line tissue in their development **or** safety research." He did not offer

any additional explanation or sources.

57.    Plaintiff Runyon responded, in relevant part:

My conscience compels me to share, on the record, some concerns that weigh heavy on me regarding the process. The phrase "of safety research" was not spoken in the interview, not that I recall, and it is a very significant omission that I think would have made a difference in

13

my reaction … I am concerned that in the interview process others may be misled to believe that at least some of these drugs were developed using fetal cells, when they were not… Please correct me if I am wrong, but it seemed as though I was being led into a sort of trap, which would reveal inconsistencies in my belief. The implication here is that religion is essentially made up of a theological or dogmatic system and the believer may be said to be sincere if they adhere to the "system" consistently. Does failure to adhere to the religious system with consistency, constitute the insincerity of a religious position? Absolutely not … If a religious person's livelihood were judged, based upon their consistency with doctrine and beliefs, would not such judgement discriminate only between the more mature in faith and those who have just begun or are still as children in their religious journey? One can sincerely pursue wholeness and consistency of faith, but at any one point in that pursuit, one falls short of that goal. Is it appropriate for an employer to insert themselves into this journey making such a judgement of faith at the risk of misjudging a person, new or still struggling with the faith, as insincere?

I am concerned that the language and methods used, from the Religious Exception questionnaire, to the interview, may scare off some associates from even engaging in the process, and for others they may feel coerced or manipulated to conclude in the interview that they are hypocrites, causing disorientation, frustration and doubt. I am concerned that the process may cause many to feel uncomfortable in their beliefs. I fear that some associates who are young in their faith or who have not yet developed the roots of their faith, to be led astray or feel lost or hopeless. This by itself is a grave injustice.

58.    Mr. Turner's sole response stated, "I am acknowledging receipt of this information."

59.    On October 22, 2021, Mr. Turner sent employees who filed religious accommodations denial letters, stating:

Thank you for submitting to the HR Department your Request for Accommodation: Religious Exemption from Mandatory COVID-19 Vaccination Policy and also for participating in the interactive process.

Although we appreciate the sincerity of your religious beliefs, we are nonetheless denying your request for accommodation. We are doing so because we have concluded that, given your particular job duties, there is no accommodation that we can offer without imposing an undue hardship on the company.

If you desire to continue working for the company, you will need to comply with our mandatory vaccination policy, but we recognize that meeting the stated deadline for the first vaccine shot is not likely realistic at this point. Accordingly, the company is giving you until the end of the day on October 29, 2021 to get your first vaccine shot and provide the HR Department with the required proof of vaccination; failure to comply with that requirement will result in termination of your employment effective October 30, 2021.

60.    No criteria for "undue hardship" and no adequate justification were provided in this letter.

61.    Plaintiffs all worked safely and successfully for Defendants prior to the vaccine mandate.

62.    There are a host of reasonable accommodations that Defendants failed to consider.

63.    Plaintiffs could have tested daily to confirm whether they were not ill.

64.    Plaintiffs could have engaged in frequent sanitizing and disinfecting.

65.    Plaintiffs could have worn gloves and respirators in the workplace.

66.    Defendants made employees work in-person throughout the pandemic. Before any vaccine was developed, the following safety measures were deemed sufficiently effective to protect employees, patients, and their loved ones: daily

testing, enhanced sanitation measures, including handwashing and disinfecting, gloves and respirators, and social distancing whenever practicable.

67.    Examples of reasonable accommodations include wearing a mask, working "at a social distance" from others, working a modified shift, getting tested, and being given the opportunity to telework. U.S. EQUAL EMPL. OPPORTUNITY COMM'N, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (May 28, 2021).

68.    "If the employer denies the employee's proposed accommodation, the employer should explain to the employee why the preferred accommodation is not being granted." *Id*.

69.    Defendants did not explain to Plaintiffs why accommodation could not be granted.

70.    Generally, the sincerity of an employee's religious beliefs "is not open to question." *United States v Seeger*, 380 U.S. 163, 185 (1965). Title VII's statutory definition of "religion" includes "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

71.    Defendants' religious animus is further evidenced by the fact that, while it refuses to accommodate employees who reject the vaccine on religious grounds, it did not require independent contractors, vendors, or patrons to be vaccinated, even though they interact with Defendants' staff and providers.

72.     Defendants evaded any sort of "bilateral cooperation," *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986). "Bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Id.*

73.     Defendants' accommodation process was arbitrary.

74.     Defendants did not explore available reasonable accommodations from the vaccine.

75.     Plaintiffs were placed on unpaid suspensions on November 12, 2021.

**Defendant Cannot Establish Undue Hardship**

76.     The prohibition against religious discrimination imposes a "duty" on employers to accommodate sincere religious beliefs, absent "undue hardship." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977).

77.     The employer, not the employee, bears the burden of showing "that it is unable to reasonably accommodate the employee's religious beliefs without incurring undue hardship." *McDaniel v. Essex Intern., Inc*., 571 F.2d 338, 341 (6th Cir.1978).

78.     An employer does not satisfy its burden of proving undue hardship "merely by showing that an accommodation would be bothersome to administer or disruptive of the operating routine." *Draper v. United States Pipe & Foundry Co*.,

527 F.2d 515, 520 (6th Cir.1975). The operative word is "undue," meaning that "something greater" than a mere hardship is required. *Id.*

79.   Defendant cannot satisfy its burden of proving undue hardship.

80.   Defendant's allegations are based in religious animus rather than science.

81.   Plaintiffs were not requesting a license to roam about uninhibited without sanitizing or wearing any personal protective equipment ("PPE"), as though no health threat existed.

82.   Plaintiffs were more than willing to comply with all safety protocols.

83.   Defendant's allegations of undue hardship lack scientific backing and, in fact, directly contravene scientific evidence supporting the effectiveness of practices such as handwashing and wearing respirators in preventing infection and death. Stella Talic et al., *Effectiveness of public health measures in reducing the incidence of covid-19, SARS-CoV-2 transmission, and covid-19 mortality: systematic review and meta-analysis*, BRIT. MED. J (2021).

84.   Defendant allowed Union employees to be unvaccinated.

85.   Defendant allowed its customers to be unvaccinated.

86.   Defendant allowed its vendors to be unvaccinated.

87.   Defendant then lifted its vaccine mandate in 2022 within months of terminating Plaintiffs and invited the former employees to reapply for

employment—whereby it would deny them work after claiming that their former positions had been filled.

**COUNT I**
**VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq*.**
**RELIGIOUS DISCRIMINATION–FAILURE TO ACCOMMODATE**
**ON BEHALF OF PLAINTIFFS AND OTHERS SIMILARLY SITUATED**

88.    Plaintiffs restate the foregoing paragraphs as set forth fully herein.

89.    Title VII prohibits an employer from discriminating against an employee "because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). Title VII's definition of "religion" includes "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

90.    Plaintiffs can establish *prima facie* cases of discrimination by showing (1) they hold sincere religious beliefs that conflict with an employment requirement; (2) they informed their employer of same; and (3) they were disciplined for failing to comply with the employment requirement." *Yeager v. FirstEnergy Generation Corp*, 777 F.3d 362, 363 (6th Cir. 2015).

91.    Plaintiffs hold sincere religious beliefs that conflict with the vaccine mandate.

92.    Plaintiffs informed their employer of same.

93.    Plaintiffs were disciplined for failing to comply with the vaccine mandate.

94.     Defendants evaded any sort of "bilateral cooperation," *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986).  Defendants have thereby violated the law.

95.     Multiple reasonable accommodations could have been offered without undue hardship, including sanitizing, disinfecting, handwashing, respirator-wearing, and testing.

96.     Defendants never explained why they could not be accommodated.

97.     Defendants never explained why no accommodations could have worked.

98.     Plaintiffs have suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation, embarrassment, and the physical effects associated therewith because of the denial of their requests, and they will so suffer in the future.

99.     Plaintiffs have been denied employment and placed in financial distress and they have suffered a loss of earnings and benefits, loss of health insurance coverage, and a loss of and impairment of their earning capacity and ability to work because of the denial of their request.

100.    Plaintiffs have been required to employ the services of an attorney as a result.

101.    Defendants' actions were intentional and/or reckless.

**COUNT II**
**VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq*.**
**RELIGIOUS DISCRIMINATION–RETALIATION**
**ON BEHALF OF PLAINTIFFS AND OTHERS SIMILARLY SITUATED**

102.   Plaintiffs restate the foregoing paragraphs as set forth fully herein.

103.   It is unlawful for an employer to retaliate against employees who communicate about employment discrimination or request accommodation for a religious practice.

104.   Plaintiffs engaged in protected activity when they requested accommodations.

105.   Defendants retaliated against them by terminating them on October 30, 2021.

106.   Defendants' threat of unpaid suspension was clearly intended to force employees to abandon their religious beliefs and receive the vaccine.

107.   Plaintiffs have suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation, embarrassment, and the physical effects associated therewith because of the unlawful retaliatory conduct, and they will so suffer in the future.

108.   Plaintiffs have been denied employment and placed in financial distress and they have suffered a loss of earnings and benefits, and a loss of and impairment of their earning capacity and ability to work because of the retaliatory conduct, and they will so suffer in the future.

109.   Plaintiffs have been required to employ the services of an attorney as a result.

110.   Defendants' actions were intentional and/or reckless.

## COUNT III
## VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT ("ELCRA")
## RELIGIOUS DISCRIMINATION–FAILURE TO ACCOMMODATE
## ON BEHALF OF ALL PLAINTIFFS

111.   Plaintiffs restate the foregoing paragraphs as set forth fully herein.

112.   Plaintiffs hold sincere religious beliefs that conflict with the vaccine mandate.

113.   Plaintiffs informed their employer of same.

114.   Plaintiffs were disciplined for failing to comply with the vaccine mandate.

115.   Defendants evaded any sort of "bilateral cooperation," *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986), when it granted a false "accommodation" of an unpaid leave of absence, which is not an accommodation at all.  Defendants therefore violated the law.

116.   Multiple reasonable accommodations could have been offered without undue hardship, including sanitizing, disinfecting, handwashing, respirator-wearing, and testing.

117.   Defendants never explained why they could not accommodate Plaintiffs.

22

118.   Defendants never explained why no accommodations could have worked.

119.   Plaintiffs have suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation, embarrassment, and the physical effects associated therewith because of the denial of their requests, and they will so suffer in the future.

120.   Plaintiffs have been denied employment and placed in financial distress and they have suffered a loss of earnings and benefits, loss of health insurance coverage, and a loss of and impairment of their earning capacity and ability to work because of the denial of their request.

121.   Plaintiffs have been required to employ the services of an attorney as a result.

122.   Defendants' actions were intentional and/or reckless.

**COUNT IV**
**VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**RELIGIOUS DISCRIMINATION–RETALIATION**
**ON BEHALF OF ALL PLAINTIFFS**

123.   Plaintiffs restate the foregoing paragraphs as set forth fully herein.

124.   It is unlawful for an employer to retaliate against employees who communicate about employment discrimination or request accommodation for a religious practice.

125. Plaintiffs engaged in protected activity when they requested accommodations.

126. Defendants retaliated against them by terminating them on October 30, 2021.

127. Defendants' denial of accommodations and encouragement to receive the vaccination regardless of Plaintiffs' religious beliefs was clearly intended to force employees to abandon their religious beliefs and receive the vaccine.

128. Plaintiffs have suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation, embarrassment, and the physical effects associated therewith because of the unlawful retaliatory conduct, and she will so suffer in the future.

129. Plaintiffs have been denied employment and placed in financial distress and they have suffered a loss of earnings and benefits, and a loss of and impairment of their earning capacity and ability to work because of the retaliatory conduct, and they will so suffer in the future.

130. Plaintiffs have been required to employ the services of an attorney a result.

131. Defendants' actions were intentional and/or reckless.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

a.      Compensatory damages for monetary and non-monetary loss;

b.      Exemplary and punitive damages;

c.      Prejudgment interest;

d.      Reasonable attorney's fees; and

e.      Such other relief as in law or equity may pertain.

<div style="margin-left:40%">

Respectfully Submitted,
HURWITZ LAW, PLLC

/s/ Noah S. Hurwitz
Noah Hurwitz (P74063)
Attorney for Plaintiff
617 Detroit Street, Suite 125
Ann Arbor, MI 48103
(844) 487-9489
noah@hurwitzlaw.com

</div>

Dated: November 2, 2022

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NICHOLAS COLLIAS, MARK DALLOO,
KENNETH DUFF, RAMON HANA,
JOSEPH HISSOM-GALANTY,
RITA KING, NICOLE LEONE,
BEATRIX MUREL, KEVIN POLLACK,          Case No.
TODD MILO RUNYON, MATTIA SAFADI,
SUSIE STOKES, DENISE TERRY,            Hon.
AUDONTE WALKER, NIHAD ZORA,

      Plaintiffs,

v.

MOTORCITY CASINO,

      Defendants.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
Kara F. Krause (P85487)
HURWITZ LAW PLLC
Attorneys for Plaintiff
617 Detroit Street, Suite 125
Ann Arbor, MI 48103
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com
kara@hurwitzlaw.com

---

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs Nicholas Collias, Mark Dalloo, Kenneth Duff, Ramon Hana, Joseph

Hissom-Galanty, Rita King, Nicole Leone, Beatrix Murel, Kevin Pollack, Todd Milo

Runyon, Mattia Safadi, Susie Stokes, Denise Terry, Audonte Walker, and Nihad

Zora ("Plaintiffs" or "Class Representatives"), by and through their attorneys

Hurwitz Law, PLLC, hereby demand a trial by jury, for all issues so triable.

<div style="text-align: right">

Respectfully Submitted,
HURWITZ LAW, PLLC

/s/ *Noah S. Hurwitz*
Noah Hurwitz (P74063)
Attorney for Plaintiff

</div>

Dated: November 2, 2022