UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MARK DALLOO, KENNETH DUFF, RAMON HANA, JOSEPH HISSOM-GALANTY, RITA KING, BEATRIX MUREL, KEVIN POLLACK, TODD MILO RUNYON, MATTIA SAFADI, SUSIE STOKES, DENISE TERRY, AUDONTE WALKER, and NIHAD ZORA, | 2:22-CV-12650-TGB-EAS<br><br>HON. TERRENCE G. BERG<br><br>ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 24), GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 25), AND DENYING PLAINTIFFS' MOTION TO STRIKE THE DECLARATION OF DARRYL FUCHS (ECF NO. 36) |
| Plaintiffs, | |
| vs. | |
| MOTORCITY CASINO, | |
| Defendant. | |

In October 2021, during the COVID-19 pandemic, Defendant MotorCity Casino required its non-unionized workforce to submit proof of vaccination against the COVID-19 virus. MotorCity's policy allowed religious exemptions to the vaccine requirement. Plaintiffs, all non-union employees working in supervisory roles at MotorCity, assert they each requested religious exemptions from the vaccine requirement but their requests were denied and they were subsequently terminated. Plaintiffs then sued MotorCity alleging that it failed to accommodate their religion

1

under Title VII of the Civil Rights Act of 1964 and subjected them to retaliation and discrimination under Title VII and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"). The Court subsequently entered an Order dismissing Plaintiffs' Title VII retaliation and ELCRA claims, as well as the claims of two Plaintiffs—Nicholas Collias and Nicole Leone.

Now before the Court is Plaintiffs' Motion for Partial Summary Judgment, ECF No. 24, and MotorCity Casino's Motion for Summary Judgment, ECF No. 25. The motions have been fully briefed. The Court heard oral argument on the cross motions on July 2, 2025. Following oral argument, Plaintiffs filed a Motion to Strike the Declaration of Darryl Fuchs, ECF No. 36, to which MotorCity responded. ECF No. 37. For the reasons set forth below, the Court will **DENY** Plaintiffs' Motion for Partial Summary Judgment, will **GRANT IN PART** and **DENY IN PART** Defendant's Motion for Summary Judgment, and will **DENY** Plaintiffs' Motion to Strike.

## I.   BACKGROUND

Defendant MotorCity Casino is a hotel and casino that features gaming, dining, spa facilities, and live entertainment. Plaintiffs Mark Dalloo, Kenneth Duff, Ramon Hana, Joseph Hissom-Galanty, Rita King, Beatrix Murel, Kevin Pollack, Todd Milo Runyon, Mattia Safadi, Susie Stokes, Denise Terry, Audonte Walker, and Nihad Zora were non-union employees working in various supervisory capacities in MotorCity's operations in October 2021 as Tables Games Supervisors, Entry

2

Screening Supervisor, Slot Supervisor, Cage Supervisor, Assistant Project Manager, Casino Analyst, and Credit Collections Clerk.

### A. MotorCity's COVID-19 Vaccination Policy

In March of 2020 the global COVID-19 pandemic struck, and that same month the State of Michigan temporarily shut down all "casinos licensed by the Michigan Gaming Control Board," which included MotorCity Casino. ECF No. 25-2. Pursuant to the State's executive orders, MotorCity was closed until August 2020, when it was allowed to reopen. ECF Nos. 25-2 to 25-6. However, when infection rates surged later in the year, MotorCity was forced to close again from November 18, 2020 until December 23, 2020. ECF No. 25-7, 25-8.

During this time period, MotorCity was still required to maintain compliance with all pre-existing gaming regulations and licensure requirements, including occupational licensing requirements and its System of Internal Controls (which in part limited to six the number of tables that a Tables Games Supervisor could oversee), as well its Development Agreement with the City of Detroit (which required MotorCity to operate a casino with approximately 100,000 square feet of gaming 24 hours per day, 365 days per year). ECF Nos. 25-9, 25-10. In addition, MotorCity adopted and regularly updated a COVID-19 Preparedness and Response Plan which prohibited employees from working if they tested positive or exhibited symptoms, implemented screening protocols, staggered employee schedules and breaks, enforced

occupancy limits, and required social distancing, face masks, and face coverings, among other things. ECF No. 25-12. MotorCity also followed guidance from the Centers for Disease Control and Prevention ("CDC") and City of Detroit Health Department governing isolation and quarantine time periods. ECF Nos. 25-13, 25-14 (recommending that unvaccinated individuals quarantine for 14 days following close contact with someone who had COVID-19, but no quarantine period for vaccinated individuals in such close contact, unless they became symptomatic).

In October 2021, MotorCity announced a mandatory COVID-19 Vaccine Policy requiring all non-union associates and new hires to receive the first dose of a COVID-19 vaccine by October 22, 2021, and to be fully vaccinated one month later. ECF No. 25-15. The Policy did not apply to MotorCity's union employees because those employees were subject to a collective bargaining agreement and MotorCity could not unilaterally impose the Vaccine Policy on them, and it was unable to negotiate an agreement on the Policy. David Turner Dep. at 20, ECF No. 25-17, PageID.1625. Those covered employees who refused to comply with the vaccination requirement, absent an accommodation, were informed that their employment would be terminated. ECF No. 25-15.

MotorCity's Vaccine Policy permitted covered employees to request reasonable accommodation for sincerely held religious beliefs and/or medical conditions, and provided that such requests for accommodation

4

must be submitted at least one week before the October 22nd vaccination deadline. *Id.* MotorCity made separate accommodation request forms available for religious and medical accommodation requests. ECF No. 25-16. When an accommodation request was submitted, MotorCity would schedule a meeting between the employee and Dr. David Turner, MotorCity's Vice President of Human Resources, and with Director of Human Resources and Employee Relations JoAnn Taylor and/or Benefits Manager Winifred Richardson also in attendance. Turner Dep. at 7, 10–11, ECF No. 25-17, PageID.1622–23. Following the meeting, Dr. Turner would review the employee's accommodation request, job duties, and proposed accommodation, as well as possible alternative accommodations. *Id.* at 12, 14–15, PageID.1623–24. Dr. Turner was the ultimate decision-maker as to whether an accommodation would be granted or not. *Id.* at 11, PageID.1623. He testified that if an accommodation could be provided without imposing an undue hardship on MotorCity, it would be granted, but if the request imposed an undue hardship, it would be denied. *Id.* at 14–16, 26, PageID.1624, 1627. For those employees whose accommodation requests were denied, MotorCity granted a short extension of time to comply with the Vaccine Policy and provide proof of immunization. *See* ECF Nos. 25-19 to 25-28. If the employee failed to provide proof of vaccination within this extended time period, he or she was terminated for non-compliance with the Vaccine Policy. *See* ECF Nos. 25-29 to 25-36.

### B. Plaintiffs' Requests for Accommodation and MotorCity's Responses

#### 1. Table Games Supervisors Dalloo, Hana, King, Safadi, Terry, Walker, and Zora

Plaintiffs Dalloo, Hana, King, Safadi, Terry, Walker, and Zora were Table Games Supervisors at MotorCity Casino at the time it adopted the COVID-19 Vaccine Policy. As Table Games Supervisors, these Plaintiffs were responsible for direct, in-person, line-of-sight supervision of all gaming operations within their assigned areas in accordance with the strict requirements under the Michigan Gaming Control and Revenue Act ("Gaming Act") and administrative rules promulgated pursuant to that statute. This included monitoring table games, players, and dealers to ensure compliance with gaming regulations and procedures and protection of gaming integrity, accurately tracking gaming activities, verifying patron wins, completing and processing gaming-related paperwork, ensuring a high level of player service, resolving player issues and concerns, coordinating dealer assignments and breaks, and directly supervising dealers within their assigned areas. Darryl Fuchs Decl. ¶ 11, ECF No. 25-10.[1] Because these Plaintiffs' job duties required onsite

---

[1]     As discussed more fully *infra*, in their Response, Plaintiffs objected to the declaration of Darryl Fuchs in support of MotorCity's undue hardship defense because he was not identified during discovery or in MotorCity's initial disclosures. ECF No. 28, PageID.2369–70. After the hearing on these cross-motions for summary judgment, Plaintiffs filed a motion to strike Fuchs' Declaration. ECF No. 36. However, Plaintiffs do

presence on the casino floor, MotorCity maintains that they could not perform their jobs remotely.

### a. Mark Dalloo

Mr. Dalloo submitted an accommodation request to MotorCity on October 15, 2021 which stated in part:

> As a Christian, we believe in the teachings of the [B]ible. In the [B]ible there are many scriptures that would explain my reasons for an exemption. Genesis 4:1, 17 and Jeremiah 1:5 demonstrates that the deceased children used in the COVID-19 vaccines were recognized by God as human souls from the point of conception. We …do not believe in abortion and we know that the COVID-19 vaccines contain aborted fetal cells … 1 Corinthians 6:19-20 and 10:31 reminds us that we are to regard our bodies as temples of [God's] holy spirit and that we are to honor God, our Creator and possessor of our bodies, by not defiling them. I cannot in good faith allow [the vaccine] to enter my body."

ECF No. 25-43. He states that he practices Chaldean Catholicism. Mark Dalloo Dep. at 89, ECF No. 25-39, PageID.1785. In addition to his accommodation request, Mr. Dalloo also submitted a letter from Father John Jaddou, an Associate Pastor from Saint Joseph Catholic Church. Fr. Jaddou stated: "[c]reated in God's image, we have been endowed [with] an intellect, which is directed toward what is true, and a will, which is directed toward what is good. Although the Church does not

---

not object to Mr. Fuchs' characterization of Plaintiffs' job duties in their response or in their motion, and accordingly the Court will accept Mr. Fuchs' descriptions of the Plaintiffs' job duties. *See* ECF No. 28, ¶¶ 29–32, 57–58, 64–66, 72–74, 78–79, 85–86, 93–94, PageID.2349–68.

oppose the vaccine, the Church does oppose being forced to take the vaccine." ECF No. 24-13.

Dr. Turner conducted an interview with Mr. Dalloo, with either Ms. Taylor and/or Ms. Richardson also present. Dalloo Dep. at 188–89, ECF No. 25-39, PageID.1810; Turner Dep. at 7, 10–11, ECF No. 25-17, PageID.1622–23. MotorCity denied Mr. Dalloo's religious accommodation request on October 22, 2021 because it determined that it would impose an undue hardship on MotorCity. ECF No. 25-19. Mr. Dalloo was given until "the end of the day on October 29, 2021 to get [his] first vaccine shot and provide ... proof of vaccination" and was told that "failure to comply with the requirement will result in termination of [his] employment effective October 30, 2021." *Id.* Mr. Dalloo failed to submit the required proof of receipt of the vaccine, and he was terminated effective November 4, 2021. ECF No. 25-29.

### b. Rita King

Ms. King submitted an accommodation request on October 9, 2021, stating:

> The Bible tells us that before God formed us in the womb, He knew us (Jeremiah 1:5) and that children are a heritage from the Lord (Psalm 127:3-5). In Proverbs 6:16-19, God tells us that there are six things the Lord hates and seven that are detestable to Him, one of those being the shed of innocent blood. Psalm 139:13-16 tells us that God knits us together in our mother's womb and I believe that abortion is a sin. I have had this belief since I was baptized at three months old. Receiving a COVID-19 vaccine would interfere with me

8

> practicing my religion in complete accordance with the word of God, as partaking in a vaccine that utilized aborted fetuses makes me complicit in an action that offends my religious faith and belief that all life, including the life of unborn children, is sacred and Holy. Also since I am not at peace with taking the vaccine, I would be acting contrary to my conscience which God tells us we should not do.

ECF No. 25-44. She also submitted a letter with her accommodation request asserting, in part, that "the free and informed judgment made by a competent adult patient concerning the use or withdrawal of life-sustaining procedures should always be respected and normally complied with" and "practical reason makes evident that vaccination is not, as a rule, a moral obligation and that, therefore, it must be voluntary." ECF No. 24-26.

Dr. Turner interviewed Ms. King regarding her accommodation request, with Ms. Taylor and/or Ms. Richardson also present. MotorCity denied Ms. King's accommodation request on October 22, 2021 as imposing an undue hardship, gave her until "the end of the day on October 29, 2021 to get [her] first vaccine shot and provide … proof of vaccination" and stated that "failure to comply with the requirement will result in termination of [her] employment effective October 30, 2021." ECF No. 25-22. Ms. King failed to submit the required proof of receipt of the vaccine, and she was terminated effective November 4, 2021. ECF No. 25-31.

### c. Denise Terry

Ms. Terry submitted a request for accommodation on October 14, 2021 in which she asserts:

> I am a Christian who believes in the Bible … I seek God's will through prayer. Through prayer, I voiced my concerns about the COVID-19 vaccine. My mind was made clear with a message from the Holy Spirit not to take the vaccine. The body is a temple of the Holy Spirit. I am commanded to take good care of it, not to defile it, and certainly not to introduce something that can make modifications to the body. In essence, the COVID-19 shot would be trying to improve or alter what God made perfectly … which in my belief, is a sinful practice.

ECF No. 25-45. Dr. Turner interviewed Ms. Terry regarding her accommodation request, with Ms. Taylor and/or Ms. Richardson present, and denied Ms. Terry's request on October 22, 2021, gave her until "the end of the day on October 29, 2021 to get [her] first vaccine shot and provide … proof of vaccination," and stated that "failure to comply with the requirement will result in termination of [her] employment effective October 30, 2021." ECF No. 25-26. Ms. Terry failed to submit the required proof of receipt of the vaccine, and she was terminated.

### d. AuDonte Walker

Mr. Walker submitted an accommodation request which stated in part:

> My faith believes in the right to life. The vaccines are contradictory to just that. Covid 19 vaccines that used cell lines originating from aborted fetuses … are morally

> compromised … These reasons go against my faith, religion,
> and moral integrity.

ECF No, 25-46. After Mr. Walker was interviewed by Dr. Turner

regarding his accommodation request, MotorCity denied the request.

ECF No. 25-27. Mr. Walker then applied for, and received, a medical

leave of absence from work for stress-related reasons. AuDonte Walker

Dep. at 20–21, ECF No. 24-45, PageID.1096–97; *see* ECF No. 25-36.

When his medical leave expired, MotorCity informed Mr. Walker that he

had until January 13, 2022 to comply with MotorCity's Vaccine Policy.

ECF No. 25-36. Mr. Walker failed to comply and he was terminated in a

letter dated January 18, 2022. *Id.*

### e. Nihad Zora

Ms. Zora submitted a religious accommodation request, stating in

part:

> As a follower of Christ I have religious beliefs about my mind,
> body, and soul. In Romans 14:23, Apostle Paul states, "But
> whoever has doubts is condemned if he eats, because the
> eating is not from faith. For whatever does not proceed from
> Faith is sin" … The scripture helps us understand that we are
> allowed to have different beliefs of what is right and wrong …
> Considering my doubts about the COVID-19 vaccination, I
> believe it is wrong [for] me to take it since aborted fetal cells
> are used and as a Christian, all life is considered sacred and
> Holy. In communion, we are taught our body is the temple for
> the Holy Spirit and through that we have God within us. My
> body needs to be a temple that is safe and healthy for God so
> if I am mandated to take the COVID- 19 vaccination … then
> I will be committing a sin.

ECF No. 25-47.

Dr. Turner interviewed Ms. Zora regarding her accommodation request, with Ms. Taylor and/or Ms. Richardson present, and MotorCity denied her request on October 22, 2021 for imposing an undue hardship. ECF No. 25-28. MotorCity gave Ms. Zora until "the end of the day on October 29, 2021 to get [her] first vaccine shot and provide … proof of vaccination," and stated that "failure to comply with the requirement will result in termination of [her] employment effective October 30, 2021." *Id.* Ms. Zora failed to submit the required proof of receipt of the vaccine, and she was terminated. Nihad Zora Dep. at 108, 120, ECF No. 25-38, PageID.1753, 1756.

### f. Ramon Hana

Mr. Hana testified at his deposition that he is a Catholic and that the COVID-19 vaccine requirement conflicted with his religious beliefs because:

> God gave me my body and it's my temple. And he created me in his own image. My religious beliefs is that I'm pro-life. And the vaccine, whether during the developing stages or at some point, has fetal cells in it … my religious beliefs don't allow me to inject anything that has fetal cells into my body if I want to—if I want to enter heaven and have eternal life with Jesus. That's what I believe.
>
> ***
>
> I believe in God. I believe in God gave me my body. And this product … it's got fetal cells in it. Not only does it have fetal cells in it, but in the websites … it's a vaccine that was created with mRNA gene therapy. And I truly in my heart and my

12

soul—and I believe in God, and he gave me my identity, my body, my soul, my DNA. I could not go against that … So when I obtained this information, I prayed about it. I got the information that I needed and I … prayed about it very hard. And God answered my prayers. I can't allow that to go into my body based on my religious beliefs.

Ramon Hana Dep. at 105, 108–10, ECF No. 25-40, PageID.1851–53.

Mr. Hana was on a leave of absence from MotorCity for stress and anxiety starting on October 2, 2021, with an anticipated return-to-work date of January 1, 2022. *Id.* at 76–77, PageID.1844. While on leave, he contracted COVID-19 in November 2021. *Id.* at 49, PageID.1837. Mr. Hana testified that Ms. Richardson informed him on December 29, 2021 that he needed to have received his first COVID-19 vaccination before returning to work and to have his second vaccine scheduled. *Id.* at 118–19, PageID.1855. He also was aware that he could request a religious accommodation to the vaccine. *Id.* at 120–21. PageID.1855.

Mr. Hana contacted his church secretary to obtain information about requesting accommodations. *Id.* at 98–100, PageID.1850. He testified that the "next step" would have been to talk to "Father Marcus" but that he "was never given the opportunity." *Id.* at 99–102, PageID.1850–51. He testified that he did not discuss or request a religious accommodation to MotorCity's Vaccine Policy when he talked to Mr. Richardson on December 29, 2021, or at any other time. *Id.* at 118–20, PageID.1855. He states he never informed MotorCity of his religious beliefs nor requested an accommodation because he was "discouraged"

13

after hearing that MotorCity had denied all religious accommodation requests. *Id.* at 120–21, 127, PageID.1855, 1857. Mr. Hana was terminated effective January 2, 2022 for non-compliance with MotorCity's Vaccine Policy. ECF No. 25-48.

### g. Mattia Safadi

Mr. Safadi submitted a reasonable accommodation request on October 11, 2021, stating in part:

> [M]y [religious belief] directs us that our bodies are temples for the Holy Spirit, and we must protect them from defilement.
>
> 1 Corinthians 3:16-17 "Don't you know that you yourselves are God's temple and that God's spirit dwells in your midst? If anyone destroys God's temple, God will destroy that person, for God's temple is sacred and you together are that temple."

ECF No. 25-49, PageID.1963. Dr. Turner conducted an interview with Mr. Safadi on October 20, 2021, with Ms. Taylor and Ms. Richardson in attendance. Mattia Safadi Dep. at 45, ECF No. 25-42, PageID.1916.

The day after this interview, Mr. Safadi received the first dose of the COVID-19 vaccine and submitted proof of the vaccine to MotorCity. ECF No. 25-50. He testified that shortly after receiving the vaccine he did not feel well, that he experienced pain in his back that same day, and that he left work and went first to see his chiropractor and then later to the Emergency Room. Safadi Dep. at 50–56, ECF No. 25-42, PageID.1918–19. He said his chiropractor stated that Mr. Safadi was

"possibly having a reaction" to the vaccine. *Id.* Mr. Safadi then went on a medical leave of absence from MotorCity. *Id.* at 56, PageID.1919.

The parties dispute whether Mr. Safadi's employment with MotorCity was terminated. Plaintiffs state that Dr. Turner told Mr. Safadi that he "would be terminated" if he did not receive the second vaccine, *id.* at 60–61, PageID.1920, and that Ms. Taylor testified in her deposition that Mr. Safadi was terminated, *see* JoAnn Taylor Dep. at 19, ECF No. 24-7, PageID.434 (testifying that Dr. Turner terminated Mr. Safadi's employment with MotorCity). MotorCity counters that Mr. Safadi testified at his deposition that he did not receive a termination letter or a payout of his paid time off and was only told that he "will be terminated." Safadi Dep. at 17–18, ECF No. 25-42, PageID.1901–10; *but see id.* at 19, PageID.1910 ("He [Dr. Turner] told me I was terminated."). Ms. Safadi subsequently submitted a request for a medical accommodation in May 2022, ECF No. 25-51, and he returned to work for MotorCity in the summer of 2022. Safadi Dep. at 77, ECF No. 25-42, PageID.1924.

### 2. Kenneth Duff

Kenneth Duff was a Valet Shift Manager with MotorCity. Kenneth Duff Dep. at 17, ECF No. 25-52, PageID.1978. However, because MotorCity was not offering valet service to its customers during the pandemic, Mr. Duff was assigned to supervise staff members conducting guest and employee COVID-19 screenings at the time the Vaccine Policy

became effective. *Id.* at 27–28, PageID.1980. This required Mr. Duff to be onsite and stand within two feet of entering guests. *Id.*

On October 14, 2021, Mr. Duff submitted a religious accommodation request for the COVID-19 vaccination, stating in part:

> My religious beliefs as a Christian do not allow me to receive a COVID-19 vaccine. God created me with an immune system and I cannot alter His design. God's words tell me [1 Corinthians 6:19] "Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you have received from God."

ECF No. 25-53. Mr. Duff also submitted a letter from Pastor David W. Hall with True Hope Ministry, which stated in part:

> Vaccines are an affront to any Christian and as an ordained Pastor and head of TRUE HOPE Ministry since 2011, I am writing to affirm this sincerely held belief of Kenneth J. Duff.
>
> ***
>
> Regarding vaccines, as believers, we know that the body is the temple of the Holy Spirit. God has created us with an immune system and we object to the intrusion of any medical intervention designed to modify God's design of the immune system[.]

ECF No. 24-18, PageID.605–06.

Dr. Turner had a meeting with Mr. Duff, with Ms. Taylor and Ms. Richardson present. Duff Dep. at 32, ECF No. 25-52, PageID.1982. MotorCity denied Mr. Duff's requested accommodation and he was provided until October 30, 2021 to submit proof of the first vaccination.

16

ECF No. 25-20. Mr. Duff did not submit such proof and he was terminated effective November 4, 2021. ECF No. 25-30.

### 3. Joseph Hissom-Galanty

Joseph Hissom-Galanty was employed as a Slot Supervisor in October 2021. Joseph Hissom-Galanty Dep. at 31, ECF No. 25-54, PageID.2003. As a Slot Supervisor, Mr. Hissom-Galanty was responsible for direct, in-person, line-of-sight supervision of all slot operations within his assigned area, in accordance with the requirements of the Gaming Act and implementing regulations, which included monitoring slot game activity, slot players, and slot department staff, assisting in processing jackpots, witnessing and authorizing player disbursements, completing and processing gaming-related paperwork, resolving player issues and concerns, and coordinating staff schedules. Fuchs Decl. ¶ 12, ECF No. 25-10, PageID.1549–50. Mr. Hissom-Galanty's work could only be performed onsite and remote work was not an option. *Id.*

Mr. Hissom-Galanty submitted an accommodation request to MotorCity on October 12, 2021, seeking an exemption based on his "sincerely held religious belief based within the bible." ECF No. 25-55, PageID.2028. He stated that he has "a sincere deeply held religious belief based within the bible" which he has held "[his] entire adult life," and that "[t]he bible prohibits welcoming foreign materials into the body, which is disease." *Id.* Dr. Turner had a meeting with Mr. Hissom-Galanty to discuss his request on October 19, 2021, with Ms. Richardson and Ms.

17

Taylor in attendance. Hissom-Galanty Dep. at 96–97, ECF No. 25-54, PageID.2019–20. Following this meeting, Dr. Turner denied Mr. Hissom-Galanty's accommodation request and gave him until October 30, 2021 to provide proof of receipt of the first COVID-19 vaccination. ECF No. 25-21.

The parties dispute what happened next. MotorCity contends that Mr. Hissom-Galanty voluntarily resigned effective October 29, 2021, citing Mr. Hissom-Galanty's email that date stating:

> I am informing you of my resignation effective 10/29/21. I have informed Starrice and my manager of my resignation. Based on the company's new vaccine policy and the denial of my religious exemption I am left with no choice other than to resign from my position. I appreciate the opportunities and the experience I have gained from my employment here at MotorCity Casino.

ECF No. 25-56. Plaintiffs counter that MotorCity "initiated" Mr. Hissom-Galanty's termination when it denied his religious accommodation request and informed him that he would be terminated if he did not vaccinate. ECF No. 28, PageID.2363. Plaintiffs further state that Mr. Hissom-Galanty's deposition testimony shows that he understood that he was terminated. *Id.* (stating Mr. Hissom-Galanty answered "correct" to counsel's question asking "[s]o you understood when your employment was terminated at MotorCity that you were being terminated because you had not complied with the COVID vaccine requirement, is that right?").

### 4. Beatrix Murel

Beatrix Murel  was working as a Cage Supervisor in October 2021. Beatrix Murel Dep. at 17, ECF No. 25-57, PageID.2038. The "Cage" is the area of the casino in which financial transactions with customers occur and are processed, similar to a bank. ECF No. 25, PageID.1419. As a Cage Supervisor, Ms. Mural supervised the frontline employees in the Cage, and her duties included monitoring guest services, assisting in the resolution of guest issues and concerns, processing physical paperwork, assisting, verifying and approving certain guest transactions, overseeing account balancing, and coordinating Cage associate assignments and breaks. Fuch Decl. ¶ 13, ECF No. 25-10, PageID.1550–51. These duties required Ms. Murel's onsite presence at MotorCity. *Id*.

Ms. Murel submitted a request for accommodation on October 11, 2021, "for the life of [her] employment at [MotorCity Casino] from the COVID-19 vaccine," stating in part:

> [The COVID-19 vaccine] holds human fetus DNA and it used human fetus DNA in the testing and developing phase of the COVID-19 vaccine. It also doesn't allow [her] to practice faith healing. Another belief also if [she] get[s] sick from the vaccine it means God is punishing [her] because [she] took the vaccine.

ECF No. 25-58. Dr. Turner met with Ms. Murel on October 21, 2021, with Ms. Taylor and Ms. Richardson in attendance. Murel Dep. at 79, ECF No. 25-57, PageID.2053. MotorCity determined that it could not provide Ms.

Murel an accommodation without imposing an undue hardship on the company, and informed Ms. Murel on October 22, 2021 that she had until October 30, 2021 to provide proof of her first vaccination or be terminated. ECF No. 25-23. Ms. Murel did not submit such proof and her employment was terminated effective November 4, 2021. ECF No. 25-32.

### 5. Kevin Pollack

Kevin Pollack held the position of Assistant Project Manager in October 2021. Kevin Pollack Dep. at 23, ECF No. 25-59, PageID.2078. In that position, Mr. Pollack was responsible for assisting the Project Manager with the installation, maintenance, and operation of slot machines and communications and systems equipment, as well as the direct management and supervision of Slot Technicians and ensuring that slot game software and game options were in compliance with gaming regulations, and creating gaming reports. He also substituted for the Slot Shift Manager as needed. MotorCity contends that Mr. Pollack could not perform all of his job duties remotely but instead was required to be present on the casino floor for extended periods of time. Fuchs Decl. ¶ 14, ECF No. 25-10, PageID.1421. Plaintiffs, on the other hand, assert Mr. Pollack could perform "most" of his job duties "off site." ECF No. 28, PageID.2364 (citing Pollack Dep. at 28, ECF No. 25-29, PageID.2079 (stating "most of them I could do off site, but probably not all.")).

Mr. Pollack submitted an accommodation request on October 15, 2021, stating in part:

> I believe my own body is a temple for the Holy Spirit. This is stated directly in the Bible (1 Corinthians 6:19:): "… your body is a temple of the Holy Spirit within you…" It is my duty and right to protect that body, for it is holy, as made by God, in His own image (Genesis 1:27). This means to me that human life is also sacred. God created the human body, along with the human immune system, to function as He created it.

> I believe that abortion is the murder of a God-created individual, in His own image, and is against the law of God as stated in the Bible (Exodus 20:13).

ECF No. 25-60. Mr. Pollack participated in a religious accommodation interview with Dr. Turner, Ms. Richardson, and Ms. Taylor on October 20, 2021. Pollack Dep. at 64, ECF No. 25-59, PageID.2088. Dr. Turner denied Mr. Pollack's accommodation request on October 22, 2021 in a letter stating, "there is no accommodation we can offer without imposing an undue hardship on the company." ECF No. 25-24. Mr. Pollack was required to submit proof of his first vaccine shot by October 30, 2021 or be terminated. *Id.* Mr. Pollack failed to submit such proof of vaccination and he was terminated effective November 4, 2021. ECF No. 25-33.

### 6. Todd Milo Runyon

Todd Milo Runyon was employed as a Casino Analyst in October 2021. Todd Milo Runyon Dep. at 44, ECF No. 25-61, PageID.2119. In that position, Mr. Runyon was responsible for evaluating the performance of slot machines and game tables to determine if changes were needed, which required visually monitoring the slot floor for specific game types

and models to ensure proper configuration, as well as sampling, testing, and inspecting the games to optimize game performance and configuration while ensuring compliance with Gaming Board regulations. Fuchs Decl. ¶ 15, ECF No. 25-10, PageID.1551–52.

Mr. Runyon submitted a lengthy accommodation request to MotorCity on October 11, 2021, seeking:

> accommodations for the provisions which requires a COVID-19 vaccine and proof of COVID-19 vaccination by Pfizer, Moderna, and Johnson & Johnson as well as any other vaccine, medicine, or medical procedure which after receiving full information on how it works, the benefits and side effects of all the contents in it and having prayed and meditated upon it, concluded through the insight of my conscience not to take it.

ECF No. 25-62. On October 22, 2021, MotorCity granted Mr. Runyon's accommodation request to work remotely "on a temporary basis pending [its] evaluation to determine whether the accommodation creates an undue hardship for the company." ECF No. 25-18.

Over time, as the pandemic continued, MotorCity determined that it needed all managers in Mr. Runyon's position to work onsite. Stacy Young 1/2/2022 email, ECF No. 25-63. As a result, Dr. Turner informed Mr. Runyon on January 3, 2022 that he needed to return to work onsite on a full-time basis, and that he needed to be vaccinated to return to work. Runyon 1/5/2022 email, ECF No. 25-25. Mr. Runyon stated that he would not receive the vaccine. *Id.* Accordingly, his employment was

terminated effective January 8, 2022 for non-compliance with the Vaccine Policy. ECF No. 25-34.

### 7. Susie Stokes

Susie Stokes was a Credit Collections Clerk for MotorCity in October 2021. Susie Stokes Dep. at 16, ECF No. 25-64, PageID.2156. In that position, Ms. Stokes was required to receive and process paper applications for lines of credit, run bank reports on customers requesting lines of credit, mail payment due reminders and collections letters for past due accounts, make collection calls on past due accounts, prepare month-end reports, update customer banking information, and run checks on active lines of credit. *Id.* at 16–18, PageID.2156–57.

Ms. Stokes was hospitalized with COVID-19 in September 2021. *Id.* at 25–26, PageID.2159. She testified that, after recovering, she "prayed on" whether she should receive the COVID-19 vaccine and determined that "spiritually, it didn't align with [her] spiritual beliefs." *Id.* at 29, PageID.2160. She also testified that she initially "wanted to request a medical exemption" to the vaccine requirement "[b]ecause [she] had just had COVID." *Id.* at 27, PageID.2159. Her doctor's office informed her that "it had been a month," so she was "clear" to receive the vaccine. *Id.* at 28, PageID.2159.

Ms. Richardson advised Ms. Stokes on October 21, 2021 that because "we don't have anything that can substantiate your reason for not getting the vaccine, you will be required to have your first shot by

4pn [sic] tomorrow." Emails, ECF No. 25-65, PageID.2165. Ms. Stokes stated that she "tried to submit the Religious exemption on yesterday and was told by Sandra she couldn't take it[.]" *Id.* Ms. Richardson responded that "[t]he deadline for submitting that document was last Friday" and that she "would not accept that [accommodation request] at this time." *Id.*

Ms. Stokes' late religious accommodation request dated October 20, 2021 stated in part:

> I am a Christian and have sincere[ly] held religious beliefs. The most sacred convictions are that my body is the temple of the Holy Spirit that dwells in me and is in relationship with God. I am the steward of my body and must respect it and put into it only which is pure.
>
> ***
>
> My religious beliefs call me to be staunchly pro-life and to oppose the use of and market for aborted fetal cells. My faith dictates that elective abortions are wrong because it is the intentional ending of human life.

ECF No. 24-53. Because Ms. Stokes did not receive the COVID-19 vaccine, her employment with MotorCity was terminated effective October 22, 2021. ECF No. 25-35.

### C. Procedural History

Fifteen Plaintiffs brought this lawsuit against MotorCity on November 2, 2022, ECF No. 1, and then filed an Amended Complaint on January 6, 2023. In that Amended Complaint, Plaintiffs asserted three

24

claims: (1) religious discrimination-failure to accommodate under Title VII; (2) retaliation under Title VII; and (3) religious discrimination under the Michigan ELCRA. ECF No. 7.

MotorCity filed a motion to dismiss Plaintiffs' Complaint, ECF No. 8, and the Court entered an order dismissing Plaintiffs' Title VII failure to accommodate claims by Plaintiffs Nicholas Collias and Nicole Leone and dismissing Plaintiffs' Title VII retaliation and ELCRA claims against all Plaintiffs. ECF No. 18. Accordingly, the only remaining claim is the Title VII failure to accommodate claim by Plaintiffs Dalloo, Duff, Hana, Hissom-Galanty, King, Murel, Pollack, Runyon, Safadi, Stokes, Terry, Walker, and Zora.

On October 9, 2024, Plaintiffs filed a motion for partial summary judgment, ECF No. 24, and Defendant MotorCity filed a motion to summary judgment, ECF No. 25. Both motions are fully briefed.

Following the hearing on the parties' cross-summary judgment motions, Plaintiffs filed a motion to strike the declaration of Darryl Fuchs, ECF No. 36, to which MotorCity responded. ECF No. 37.

## II.   LEGAL STANDARD

"The fact that the parties have filed cross-motions for summary judgment does not mean ... that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 447 (6th Cir. 2003). Instead, the Court must apply the well-recognized summary-judgment standard in evaluating both motions.

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). No genuine material factual dispute exists if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the Court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Id.* The nonmoving party's evidence need not be in admissible form. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). But that party "must show that [he] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

## III.   DISCUSSION

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e-2(a)(1). "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to

26

an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). The United States Supreme Court has clarified that Title VII demands more than "mere neutrality" toward employees' religious practices; rather, it gives religious practices "favored treatment," "affirmatively obligating" employers to provide religious accommodations so long as they do not impose an undue hardship on the employer. *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015) ("Title VII requires otherwise-neutral policies to give way to the need for an accommodation.").

To analyze a religious accommodation claim under Title VII, the Court "begins with the question of whether the employee has established a prima facie case of religious discrimination." *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007) (quoting *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987)). To establish a prima facie case, the plaintiff must show that (1) he holds a sincere religious belief that conflicts with an employment requirement, (2) he informed the employer about the conflict, and (3) he was discharged or disciplined for failing to comply with the conflicting requirement. *Id.* Once the plaintiff establishes his prima facie case, the burden shifts to the employer "to show that it could not reasonably accommodate the employee without undue hardship." *Id.* (quoting *Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002)).

### A. Prima Facie Case

Plaintiffs argue that they have established their prima facie case of religious discrimination. They contend that they possess sincerely held religious beliefs that preclude COVID-19 vaccination and that MotorCity failed to reasonably accommodate those beliefs. MotorCity argues that three of the 13 remaining Plaintiffs—Mr. Hana, Mr. Hissom-Galanty, and Mr. Safadi—cannot establish a prima facie case on their failure to accommodate claims.

### 1. Mr. Hana

MotorCity argues that it is entitled to summary judgment on Mr. Hana's religious discrimination claim because he admits that he never made a religious accommodation request to MotorCity, and thus he failed to "inform [MotorCity] about the conflict" between his religious beliefs and the COVID-19 vaccine mandate as required to establish the second prong of his prima facie case. ECF No. 25, PageID.1426–27 (citing Hana Dep. at 118–21, ECF No. 25-40, PageID.1855). Plaintiffs respond that Mr. Hana was never "formally" aware of MotorCity's COVID-19 vaccine mandate "until after the accommodation request deadline had already passed" because he was on a medical leave of absence when MotorCity announced the COVID-19 vaccine mandate. ECF No. 28, PageID.2374. Plaintiffs further assert that MotorCity cannot rely on Mr. Hana's failure to meet MotorCity's "arbitrary deadline" for submission of a religious

accommodation request as the basis for denying that request. ECF No. 24, PageID.336–37.

To survive summary judgment, Mr. Hana must have informed MotorCity that he needed a religious accommodation. *See Reed v. United Auto. Workers*, 569 F.3d 576, 580 (6th Cir. 2009). It is undisputed in this case that Mr. Hana never made a religious accommodation request to MotorCity—timely or untimely. Mr. Hana was on a medical leave of absence starting on October 2, 2021, with an anticipated return date of January 1, 2022, when MotorCity announced its mandatory COVID-19 Vaccine Policy. Mr. Hana did not submit a request for accommodation within the time period set forth in the Policy (one week before the October 22, 2021 vaccination deadline), or at any other time. Mr. Hana testified, however, that he was aware of the Vaccine Policy while he was on leave and that he was aware that he could submit a religious accommodation request. Hana Dep. at 118–21, ECF No. 25-40, PageID.1855 (agreeing that he "knew that there was a possibility that [he] could request a religious accommodation request to the vaccine mandate"). He further testified that he spoke with Ms. Richardson on December 29, 2021, and she informed him of the vaccine mandate and that he needed to have received his first COVID-19 vaccination before returning to work, and to have his second vaccine scheduled. *Id.* However, Mr. Hana nevertheless admits that he never requested a religious accommodation to the vaccine mandate from Ms. Richardson, or anyone else at MotorCity:

Q.   And during that [December 29, 2021] conversation [with Ms. Richardson], you never mentioned religious objection to taking the vaccine?

A.   I didn't mention it, no.

\*\*\*

Q.   And you never called Ms. Richardson to find out more about that process of requesting an accommodation, did you?

A.   I'm going to be truthful, I never did call her.

\*\*\*

Q.   Did you try to talk to anyone else in human resources about a religious accommodation?

A.   No

Q.   You didn't e-mail, like, Mr. Turner, for example, and say, "Hey, I have a religious objection to this vaccine. Can I get an exemption?"

A.   I did not do that

\*\*\*

Q.   And did you talk to anyone from MotorCity Casino about a religious objection to the vaccine?

A.   I did not.

*Id.*

Therefore, according to Mr. Hana's undisputed testimony, he does not meet the second prong of his prima facie case because he was aware of MotorCity's Vaccine Policy and that he could submit a religious

30

accommodation request, but he never "informed" MotorCity about any conflict between its vaccine mandate and his religious beliefs. This is not a matter of MotorCity enforcing an "arbitrary" accommodation deadline with respect to Mr. Hana, as Plaintiffs suggest. He admittedly never made *any* request for an accommodation to MotorCity—timely or untimely—despite his knowledge that he could do so. MotorCity is therefore entitled to summary judgment on Mr. Hana's Title VII religious accommodation claim, and his claim will be **DISMISSED WITH PREJUDICE**. *See Laney v. Ohio Dep't of Youth Servs.*, 448 F. App'x 553, 556 (6th Cir. 2011) (holding that the plaintiff's admission that she never followed the defendant's procedure for requesting a religious accommodation "is fatal to [her] claim."); *see also Doll v. City of Central City Mun. Water and Sewer*, No. 4:12CV-00008, 2014 WL 774273, at *3 (W.D. Ky Feb. 25, 2014) ("A party asserting a religious accommodation claim must have actually sought accommodation.").

### 2. Mr. Safadi

#### a. Requested accommodation

Mr. Safadi submitted a timely reasonable accommodation request to MotorCity, and then received the first dose of the COVID-19 vaccine the day after his interview with Dr. Turner. He submitted proof of that vaccine before MotorCity responded to his accommodation request. Mr. Safadi experienced an adverse reaction to the vaccine the same day he received it and went on a leave of absence from MotorCity.

MotorCity first argues that it is entitled to summary judgment on Mr. Safadi's Title VII religious accommodation claim because he "effectively withdrew his request by becoming vaccinated before MotorCity could respond to his request." ECF No. 25, PageID.1427. Plaintiffs dispute that Mr. Safadi withdrew his accommodation request and assert that Mr. Safadi testified he only received the first dose of the vaccine "against [his] faith" and "out of fear" that he would be "laid off" and unable "to support [his] family." Safadi Dep. at 42–43, ECF No. 25-42, PageID.1916. Plaintiffs assert that Mr. Safadi did not receive the second dose of the vaccine and thus he still needed an accommodation. ECF No. 28, PageID.2371–72.

The Court finds that there is a fact issue as to whether Mr. Safadi "effectively withdrew" his requested accommodation by receiving the first dose of the vaccine. The only case MotorCity cites in support of its argument, *Goldschmidt v. New York State Affordable Housing Corporation*, 380 F. Supp. 2d 303 (S.D.N.Y. 2005), does not support a grant of summary judgment for MotorCity. In *Goldschmidt*, the plaintiff/employee affirmatively withdrew his requested accommodation before the defendant agency decided it. *Goldschmidt*, 380 F. Supp. 2d at 311 (religious accommodation claim dismissed when employee withdrew his request for an accommodation after his supervisors expressed opposition to that request but before there was a formal denial). There is no evidence here that Mr. Safadi *affirmatively withdrew* his requested

accommodation, and thus it is a question for the jury as to whether his receipt of the first vaccine should be considered as a withdrawal of his request for an accommodation. And, as Plaintiffs explain, Mr. Safadi did not receive the second vaccine as required by Defendant's policy; and he therefore still needed an accommodation before he could return to work.

### b. Discharge or discipline

MotorCity next argues that Mr. Safadi cannot demonstrate that MotorCity discharged or disciplined him for failing to comply with its Vaccine Policy and therefore he has failed to show that he was subject to an adverse action and cannot meet the third prong of his prima facie burden. ECF No. 25, PageID.1427–28. MotorCity asserts that Mr. Safadi went on an extended leave of absence after receiving the first dose of the vaccine and that he has no evidence that he was terminated. *Id.* Mr. Safadi testified that Dr. Turner told him on January 30, 2022, that he would be terminated if he did not receive the second dose, and that he believed he had been terminated. Safadi Dep. at 16–19, ECF No. 25-42, PageID.1909–10. MotorCity asserts, however, that Dr. Turner testified that he was merely explaining to Mr. Safadi the "likely outcome" if he attempted to return to work in violation of the Policy, but that he would not be terminated unless he attempted to return to work in violation of the Policy. ECF No. 28-1, PageID.2392 (stating "if you don't have your second shot, then you would be … not permitted to enter the building and subsequently terminated for noncompliance with the policy" but that he

"can't do it [discharge him] in advance" and "couldn't do it otherwise any faster than … your return to work date.").

Mr. Safadi testified Dr. Turner told him he was terminated, and that he applied for unemployment but did not receive it. *Id.* at 19–20, PageID.1910.[2] However, he also testified that he never received a letter from MotorCity terminating his employment, he did not receive a payout of his paid time off, that he received a call from someone in HR in March 2022 asking if he wanted to extend his leave, and that he was granted a medical exemption from the vaccine requirement in May 2022 and returned to work. *Id.* The Court finds, examining all this disputed record evidence in the light most favorable to Mr. Safadi, and drawing all reasonable inferences in his favor, that there is a fact issue as to whether

---

[2]     Plaintiffs also assert that when Mr. Safadi applied for unemployment on April 5, 2022, the State of Michigan informed him that he was "fired … on October 22, 2021 under the employer's 'At-Will' policy." ECF No. 28, PageID.2372 (citing ECF No. 24-42, PageID.1071). However, as MotorCity correctly states in its reply brief, this evidence is inadmissible. The Michigan Employment Security Act ("MESC") "prevents a party from using information obtained by the MESC from an employer in a court proceeding 'unless the commission is a party to or a complainant in the action or proceeding, or unless used for the prosecution of fraud, civil proceeding, or other legal proceeding pursuant to subdivision (2).'" *See Summerville v. ESCO Co. Ltd. P'Ship*, 52 F. Supp. 2d 804, 811 (W.D. Mich. 1999) (quoting MCL § 421.11(b)(1)(iii)); *see also Gaines v. FCA US LLC*, 522 F. Supp. 3d 295, 303–04 (E.D. Mich. 2021) (Parker, J.) (plaintiff could introduce evidence she applied for unemployment benefits to counter argument she did not mitigate her damages but could not offer evidence that she was awarded benefits or the amount awarded).

Mr. Safadi's employment with MotorCity was terminated, and if so, when, and that MotorCity therefore is not entitled to summary judgment as to Mr. Safadi's Title VII accommodation claim

### 3. Mr. Hissom-Galanty[3]

MotorCity argues that it is entitled to summary judgment on Mr. Hissom-Galanty's reasonable accommodation claim because he cannot demonstrate that MotorCity discharged or disciplined him for failing to comply with the Vaccine Policy. MotorCity asserts that Mr. Hissom-Galanty instead affirmatively resigned his employment with MotorCity in an email dated October 29, 2021 "informing [MotorCity] of [his] resignation effective 10/29/21." ECF No. 25-56.

Plaintiffs do not dispute that Mr. Hissom-Galanty submitted the resignation email, but instead argue that, contrary to the Sixth Circuit's definition of a prima facie case for a Title VII religious accommodation claim, an employer's actions do not need to rise to the level of a discharge for the action to be materially adverse. Plaintiffs first assert that the mere denial of an accommodation, before Mr. Hissom-Galanty resigned,

---

[3] MotorCity asserted in its briefing that it is entitled to summary judgment on Mr. Hissom-Galanty's religious accommodation claim because he cannot demonstrate that he had a sincerely held religious belief in conflict with the Vaccine Policy. At oral argument on the parties' motions for summary judgment on July 2, 2025, however, MotorCity withdrew this argument. Consequently, MotorCity is not entitled to summary judgment on Mr. Hissom-Galanty's claim for failure to demonstrate that he held a sincere religious belief.

is sufficient to meet the prima facie case for a Title VII failure-to-accommodate claim. The Court disagrees. An element of a plaintiff's prima face claim is that the plaintiff employee "was discharged or disciplined for failing to comply" with an employment requirement in conflict with the employee's religious beliefs. *See Stanley v. ExpressJet Airlines, Inc.*, 808 F. App'x 351, 355–56 (6th Cir. 2020). Mere denial of an accommodation is not mentioned. "Unless a plaintiff has suffered some independent harm caused by a conflict between his employment obligation and his religion, a defendant has no duty to make any kind of accommodation." *Reed v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 569 F.3d 576, 580 (6th Cir. 2009) (noting that the Sixth Circuit has "declined to relieve a religious accommodation plaintiff of his burden to establish a prima facie case, including the requirement that he demonstrate that he has been discharged or disciplined."). While Plaintiffs cite to *Morrissey v. Laurel Health Care Company*, 946 F.3d 292, 299 (6th Cir. 2019), that case involved a failure to accommodate claim under the Americans with Disabilities Act ("ADA"), not a religious accommodation claim under Title VII. *See id.* The ADA provides an independent cause of action of failure to accommodate. *See Anderson v. General Motors LLC*, 45 F. Supp. 3d 662, 670 (E.D. Mich. 2014) (Michelson, J.) (citing *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011)); 42 U.S.C. § 12112(b)(5)(A) (defining discrimination under the ADA as including "not making reasonable

accommodations …")). Title VII contains no such stand-alone failure-to-accommodate claim and instead includes only disparate treatment or disparate impact claims. *See* 42 U.S.C. § 2000e-2(a)(1), (2).

Plaintiffs also argue that the threat of discharge or other adverse employment practice is enough. *See* ECF No. 28, PageID.2376–77. Plaintiffs contend that MotorCity "initiated" Mr. Hissom-Galanty's termination when it denied his religious accommodation request and informed him that he would be terminated if he did not vaccinate. *Id.* at PageID.2375.

First, the Sixth Circuit has "consistently held that a prima facie case of religious discrimination requires discharge or discipline for failure to comply with an employment requirement." *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003) (collecting cases). In *Goldmeier*, the Sixth Circuit expressly rejected the argument that requiring discharge or discipline is "obsolete." *Id.* at 636–37 ("[W]e hold that discharge or discipline remains an element of a prima facie case of religious discrimination in employment."); *see also Tepper*, 505 F.3d at 514 (a prima facie case includes discharge or discipline); *Crider v. Univ. of Tenn.*, 492 F. App'x 609, 613 (6th Cir. 2012) (same). Still, a plaintiff may satisfy this element by showing that he was actually discharged or disciplined, or, in the alternative, that he was constructively discharged. *See Goldmeier*, 337 F.3d at 635; *see also Mohamed v. 1st Class Staffing, LLC*, 286 F. Supp. 3d 884, 903 (S.D. Ohio 2017) (collecting cases holding

that "discharge or discipline is an element of a prima facie case of religious discrimination" and that "[a] plaintiff may satisfy this element by showing that he was actually discharged or disciplined, or, in the alternative, that he was constructively discharged.").

While Plaintiffs do not appear to dispute that Mr. Hissom-Galanty sent the resignation email, and, as counsel for MotorCity contended at oral argument, Plaintiffs did not specifically plead constructive discharge, Plaintiff do argue that MotorCity's threat of discharge to Mr. Hissom-Galanty is a sufficient adverse action in this case. ECF No. 28, PageID.2376–77. Plaintiffs argue that MotorCity gave Mr. Hissom-Galanty an ultimatum of either getting the COVID-19 vaccine or being terminated. "When an employer acts in a manner so as to have communicated to a reasonable employee that [he] will be terminated, and the plaintiff employees resigns, the employer's conduct may amount to constructive discharge." *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014) (noting that constructive discharge occurs where the employer's actions demonstrate that "the writing was on the wall and the axe was about to fall.") (quoting *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331–32 (7th Cir. 2002)). To the extent Plaintiffs argue that MotorCity gave Mr. Hissom-Galanty no choice between violating the obligations of his honestly held beliefs or termination for not complying with the vaccine mandate, and construing the evidence in the light most favorable to Plaintiffs, the Court finds that there is a genuine issue of

38

material fact as to whether Mr. Hissom-Galanty voluntarily left his job or whether MotorCity discharged him. *See Mohamed*, 286 F. Supp. 3d at 906 (finding that "a factfinder could reasonably conclude that defendants actually discharged plaintiffs for being absent to perform their prayers" when plaintiffs testified that "defendants threatened to fire anyone who left to go pray" and "defendants confirmed to the plaintiffs who later called or came in that they had been terminated."); *Barton v. Metro. Gov't of Nashville and Davidson Cnty.*, No. 3:20-cv-00118, 2022 WL 989100, at *3 (M.D. Tenn. Mar. 31, 2022) (a genuine disputed fact exists as to whether plaintiff voluntarily left her job or whether she was discharged when she presented evidence that defendant gave her an ultimatum of either failing to fulfill the obligations of her honestly held belief or transferring to a different department).

In this case, Dr. Turner told Mr. Hissom-Galanty that he would be terminated unless he received the vaccine before returning to work, and employees who did not receive the COVID-19 vaccine were terminated. Thus, Plaintiffs have presented evidence that "the writing was on the wall and the axe was about to fall." *See Laster*, 746 F.3d at 728. The Court therefore finds that Plaintiffs have raised a genuine issue of material fact as to whether Mr. Hissom-Galanty was discharged or disciplined, and thus whether he has established his prima facie case of religious accommodation discrimination. MotorCity's motion for summary judgment to dismiss Mr. Hissom-Galanty's claim therefore will be denied.

### 4. Plaintiffs' sincerely held religious beliefs

Plaintiffs argue in their motion for summary judgment that the Court should find that all Plaintiffs possessed sincere religious beliefs precluding the COVID-19 vaccination when they made their accommodation requests. Plaintiffs argue that MotorCity did not contest the sufficiency of Plaintiffs' religious beliefs when reviewing their accommodation requests and there is "evidence from which a jury can confirm Plaintiffs' religiosity." ECF No. 24, PageID.333–34. MotorCity responds that Plaintiffs fail to establish, *as a matter of law*, they their accommodation requests were based on sincerely held religious beliefs, and instead only argue that they have presented evidence from which a jury *could* so conclude. ECF No. 27, PageID.2324.

The "sincerity" of a plaintiff's professed beliefs "is a factual finding" and the Court "'need not take a [plaintiff] at his word' that he is sincere in his beliefs." *Speer v. UCOR LLC*, No. 3:22-cv-426, 2023 WL 7305037, at *8 (E.D. Tenn. Nov. 6, 2023) (quoting *Ackerman v. Washington*, 16 F.4th 170, 180 (6th Cir. 2021)). That MotorCity did not dispute the sincerity of the Plaintiffs' asserted religious beliefs when denying their accommodation requests does not preclude it from challenging the sincerity of those asserted beliefs here. *See Scafidi v. B. Braun Med., Inc.*, 713 F. Supp.3d 1231, 1241 (M.D. Fla. 2024) ("While Braun seemed to assume that Scafidi's religious beliefs were sincerely held before denying her request for religious accommodation, Braun has not waived its ability

40

to challenge this element in this Court[.]"). The Court finds that a reasonable jury could accept or reject Plaintiffs' contentions that they have sincere religious beliefs that require them to decline the COVID-19 vaccine and that the evidence is not so overwhelming as to warrant summary judgment for Plaintiffs. *See EEOC v. Publix Super Markets, Inc.*, 481 F. Supp. 3d 684, 699 (M.D. Tenn. 2020) ("Summary judgment is seldom appropriate in subjective inquiries and … should be granted only where … the only conclusion a reasonably jury could make is that the employee's religious assertion [was or] was not bona fide.").

### 5. Reasonable accommodations

Plaintiffs argue that MotorCity did not make any efforts toward reasonably accommodating Plaintiffs' religious beliefs, such as those accommodations offered to union employees, who were not required to receive the vaccine, and those offered to Michael Golden, MotorCity's Executive Chef, who was granted a medical exemption. MotorCity responds that even though an interactive process is not required in Title VII reasonable accommodation cases, it did engage in an interactive process with the Plaintiffs who requested accommodations. Plaintiffs agree that MotorCity's HR staff—Turner, Taylor, and/or Richardson—personally met with each Plaintiff who requested an accommodation to address the conflict between their asserted beliefs and the Vaccine Policy and potential accommodations.

First, the Court agrees with MotorCity that courts in the Sixth Circuit have not imposed a requirement for employers to engage in the interactive process in Title VII religious accommodation cases. A recent unpublished opinion from the United States Court of Appeals for the Sixth Circuit addressed this issue and found that while the ADA does require an interactive process, "Title VII's regulations contain no similar reference to an interactive process." *Kizer v. St. Jude Children's Rsch. Hosp.*, No. 24-5207, 2024 WL 4816856, at *3 (6th Cir. Nov. 18, 2024). In *Kizer*, a hospital employee requested a religious exemption from receiving the COVID-19 vaccine, and the hospital refused, ultimately terminating the employee. *Id.* at *1. The Sixth Circuit affirmed the district court's grant of summary judgment in favor of the hospital, finding that the hospital employer demonstrated undue hardship. *Id.* The Sixth Circuit found that there was no interactive process requirement for a Title VII religious accommodation claim, but the hospital nevertheless had shown a "thorough information-gathering process with input from [the employee] herself" through her request form. *Id.* at *4–5. Additionally, the hospital provided evidence regarding the risk of COVID-19 to its patients. *Id.* The hospital also provided evidence that it had gathered information about the employee's "essential duties and whether her job could be performed remotely." *Id.* at *3–4. In *Kizer*, the court concluded:

> We thus cannot say that, as a matter of law, [Defendant] violated an implicit interactive-process duty under Title VII (as yet unrecognized in this circuit). [Defendant] has presented evidence of a thorough information-gathering process with input from Kizer herself. And the EEOC is clear that Title VII contains no such hard and fast requirement of an interactive process.

*Id.* at *5.

Second, the Court agrees that MotorCity in any event has put forth evidence from which a reasonable jury could find that MotorCity did engage in an interactive process with the Plaintiffs who submitted religious accommodation requests before it determined that an accommodation could not be made without causing an undue hardship on MotorCity. Whether MotorCity ultimately can meet its burden to demonstrate undue hardship will be discussed *infra*. Plaintiffs therefore fail to show they are entitled to summary judgment on their Title VII reasonable accommodation claims based on an alleged failure to engage in the interactive process.

Next, Plaintiffs argue that MotorCity improperly "weaponized" the accommodation deadline to deny Mr. Hana's and Ms. Stokes' accommodation requests. But Plaintiffs' argument that MotorCity's accommodation deadline was arbitrary and prevented Mr. Hana from requesting an accommodation fails. As discussed *supra*, Mr. Hana was not denied an accommodation for failing to meet MotorCity's deadline; he

was not considered for an accommodation because it is undisputed that he never made a request for one.

As for Ms. Stokes, Plaintiffs have presented evidence that MotorCity declined to accept her accommodation request because it was untimely. *See* Emails, ECF No. 25-65, PageID.2165 (Ms. Richardson writing "The deadline for submitting that document [Ms. Stokes' religious accommodation request] was last Friday, I would not accept that at this time."). However, there is a question of fact as to when Ms. Stokes was aware of the Vaccine Policy, whether she intended to submit a medical exemption, and when she decided to request a religious exemption. And even assuming that MotorCity should have accepted Ms. Stokes' accommodation request, that does not entitle her to summary judgment on her religious accommodation claim. MotorCity was not required to accommodate her religious beliefs if doing so would impose an undue hardship. As discussed next, MotorCity has presented evidence creating a genuine issue of act as to whether accommodating Plaintiffs' accommodation requests, including Ms. Stokes' request, would have imposed an undue hardship.

Accordingly, the Court concludes that genuine issues of fact exist as to whether Plaintiffs Dalloo, Duff, Hissom-Galanty, King, Murel, Pollack, Runyon, Safadi, Stokes, Terry, Walker, and Zora can establish prima facie Title VII failure to accommodate claims. However, MotorCity

is entitled to summary judgment on Mr. Hana's claim, which will be dismissed with prejudice.

## B. Undue Hardship

Assuming Plaintiffs Dalloo, Duff, Hissom-Galanty, King, Murel, Pollack, Runyon, Safadi, Stokes, Terry, Walker, and Zora have established a prima facie claim, the Court next considers whether MotorCity can establish as a matter of law that it could not accommodate those Plaintiffs' asserted religious beliefs without undue hardship. *Tepper*, 505. F.3d at 514. To demonstrate undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023). Courts must apply this test "in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Id.* at 470–71. Accordingly, "[u]ndue hardship refers to more than just the economic cost of providing an accommodation. Employers may consider intangible costs like the loss of office efficiency and the safety risk an accommodation can pose to other employees." *Speer*, 2024 WL 4370773, at *10. And, the employer does not necessarily need to prove the costs that it would have incurred if it provided an accommodation; "it is entitled to rely on its projections." *Id.* (citing *Virts*, 285 F.3d at 519 ("[I]t has been found that an employer does not have to actually experience the

45

hardship in order for the hardship to be recognized as too great to be reasonable."); *Crider*, 492 F. App'x at 615 ("[A]n employer may show undue hardship before an accommodation has been put into place")).

MotorCity argues that exempting Plaintiffs from its Vaccine Policy would have imposed an undue hardship on it for many reasons, considering both economic and noneconomic factors.[4] MotorCity first argues that allowing Plaintiffs to avoid the vaccine requirement would have imposed an undue hardship arising from quarantine leaves that were required at that time for employees both exposed to the COVID-19 virus and those employees with symptoms of the virus, thereby affecting staffing levels. In October 2021, unvaccinated persons exposed to the virus were required to quarantine for 14 consecutive days following close contact (as defined by the CDC) with a person who had COVID-19, while

---

[4]    Plaintiffs argue that MotorCity waived its undue hardship defense because it responded to an interrogatory that it "has not discharged any employee seeking an accommodation due to undue hardship." ECF No. 28, PageID.2340, 2348 (citing ECF No. 24-4, PageID.382). MotorCity responds that it did not waive its undue hardship defense, and that the termination decision was separate from the decision of whether to accommodate. Plaintiffs' accommodation requests were denied because MotorCity determined that they would have imposed an undue hardship. Plaintiffs were terminated because they failed to comply with the Vaccine Policy. The Court agrees with MotorCity and finds that it did not waive its undue hardship defense. It stated in every letter to the Plaintiffs when denying their accommodation requests that the denials were based on undue hardship, *see* ECF Nos. 25-19 to 25-28, and stated in the termination letters to Plaintiffs that they were terminated for non-compliance with the Vaccine Policy. *See* ECF Nos. 25-29 to 25-36.

fully vaccinated people were not required to quarantine following such close contact unless they began to exhibit symptoms or tested positive. MotorCity explains that in 2021 the Delta variant of COVID-19 was surging and employees subject to the Vaccine Policy took 134 quarantine leaves due to exposure to COVID-19 and 182 leaves to isolate for being symptomatic, testing positive, or while awaiting test results, resulting in a cumulative total of 2,752 lost work days for that group. Darryl Fuchs Decl., ECF No. 25-10, PageID.1547–48.[5] MotorCity states that these

---

[5]    Plaintiffs argue that Mr. Fuchs' Declaration should be stricken because he was not listed in MotorCity's initial disclosures nor identified in its discovery depositions. ECF No. 28, PageID.2369–70; ECF No. 36. Plaintiffs further assert that Mr. Fuchs' declaration includes data and statistics not produced by MotorCity during discovery, asserting that data was responsive to a document request for all documents "that Defendant used or relied upon for the proposition that accommodating Plaintiffs' accommodation requests … posed an undue hardship on Defendant," and no attendance documents were produced. Plaintiffs alternatively seek to reopen discovery to depose Mr. Fuchs. MotorCity responds that Plaintiffs admit much of what is contained in Mr. Fuchs' declaration regarding the Plaintiffs' job duties and MotorCity's compliance with regulatory and other requirements, and primarily object to the "data and statistics" in the declaration from employee attendance records. ECF No. 30, PageID.2416–17; ECF No. 37. The Court agrees. *See* ECF No. 28, ¶¶ 6–10, 30–32, 65–66, 73–74, 79–80, 86, 94, PageID.2349–68. MotorCity argues that Plaintiffs did not request the attendance data during discovery, and MotorCity should not be held responsible for that failure. It argues that while it certainly tracks employee attendance and other aspects of gaming operations, there is no record evidence that it "used or relied upon" in making its undue hardship determinations, as opposed to anecdotal and institutional knowledge derived from operating a casino. Given Plaintiffs' admission of the majority of the statements in

absences are in addition to other, "typical" employee absences, such as non-COVID sick days, Family and Medical Leave Act ("FMLA") leaves, and personal days and vacations. MotorCity's employees were exposed to members of the public for extended periods of times, indoors, with customers removing their masks to eat, drink, and verify their identities, and while gaming chips, money, cards, dice, glasses, and other items were being constantly exchanged.

MotorCity further states that the strictly regulated environment in which it operates magnified the COVID-related absences because the positions formerly occupied by the Plaintiffs all required occupational licensure from the Gaming Board, in most cases at Level One, the highest level. Therefore, if one of the Plaintiffs was required to quarantine because he or she was unvaccinated, that open shift could only be filled by another employees holding the necessary gaming license for the duration of the quarantine leave. And that employee would also need to be qualified to perform the specific job duties of the position which require special skills and Gaming Board requirements. If an appropriate replacement was not available, MotorCity would be required to shut

---

Mr. Fuchs' declaration, the Court will not strike it. Further, if Plaintiffs did not seek the attendance records during discovery, MotorCity is not precluded from relying on that information in its defense of Plaintiffs' claims. In any event, as explained *infra*, the Court finds a genuine issue of fact as to whether MotorCity could accommodate Plaintiffs' religious beliefs without undue hardship, even without relying on the attendance "data and statistics" in Mr. Fuchs' declaration.

down portions of its casino or otherwise reduce or limit operations, which it asserts would result in added costs and an undue hardship.

For example, Plaintiffs Dalloo, King, Safadi, Terry, Walker, and Zora, as Table Games Supervisors, generally each supervised six gaming tables at a time. Therefore, if one of these unvaccinated Plaintiffs were required to quarantine for 14 days for coming into close contact with a person with COVID (whereas a similarly-situated vaccinated employee would not need to quarantine), MotorCity would be required to find an appropriate replacement (possibly forcing overtime with associated extra costs) and/or close table games to comply with Gaming Board staffing requirements (losing revenue and negatively impacting the customer experience). Plaintiffs Hissom-Galanty, Pollack, and Runyon also each supervised various aspects of MotorCity's employees and operations to ensure compliance with Gaming Board regulations, and their absence would impact MotorCity's ability to comply with applicable Gaming Board regulations, reducing or limiting MotorCity's operations. Likewise, Plaintiffs Duff, Murel, and Stokes supervised staff and an extended absence of these Plaintiffs would have impacted MotorCity's operations and required it to incur added costs to cover their duties. And MotorCity further asserts that the closing or reducing of table games, slots machines, cages, or points of entry into the casino because of loss of an available supervisor would have resulted in a loss of work for those other employees working in those areas and may have added costs to the extent

MotorCity was required by the collective bargaining agreement to pay unionized employees not to work or to pay forced overtime. MotorCity further argues that such closures or reduced staffing would negatively impact the customer experience and result in a potential loss of business. ECF No. 25, PageID.1432–37, citing ECF Nos. 25-9; 25-10, PageID.1548–51; 25-14.

MotorCity further explains that it is required to maintain a Development Agreement with the City to maintain its casino license, and the Development Agreement requires MotorCity to operate a casino with a gaming floor of 100,000 square feet, 24 hours per day, 365 days per year and also operate other amenities. Fuchs Decl., ECF No. 25-10, PageID.1548. MotorCity asserts that if it had to cease operations because of inadequate staffing, it would potentially be in default under the Development Agreement, which could lead to a suspension or revocation of its casino license. ECF No. 25, PageID.1439 (citing Admin. R. 432.206(b); Admin. R. 432.208c(2).

Finally, MotorCity argues that permitting its employees to remain unvaccinated constitutes an undue hardship because it creates risks to health and safety to its employees and customers by the spread of COVID-19 to others as the colder weather meant more people were spending time indoors and the COVID Delta variant was surging. MotorCity argues that no other accommodation, such as frequent testing, continuing to mask, and social distancing, would have eliminated the

need for Plaintiffs to quarantine for at least 14 full days following close contact with an individual with COVID-19. The only exception to the CDC's quarantine requirement was vaccination. And remote work was not an option for the positions held by Plaintiffs, as their on-site presence was required to properly perform their job functions. ECF No. 25-10.

Plaintiffs respond that MotorCity's proffered undue hardship defense is "nothing more than speculative attorney argument" that must be disregarded by the Court. Plaintiffs argue that MotorCity never implemented any "staffing initiatives" because of the quarantine requirements and never performed any actual cost assessment in consideration of Plaintiffs' religious accommodation requests. ECF No. 28, PageID.2383–84 (citing Turner Dep. at 31, 61, ECF No. 25-17, PageID.1628, 1635). Similarly, Plaintiffs assert that MotorCity's contention that it would have been in default of its Development Agreement if it could not appropriately staff its operations is speculative. Plaintiffs argue that MotorCity is required to demonstrate actual costs.

However, the employer does not necessarily need to prove the costs that it would have incurred if it provided an accommodation; "it is entitled to rely on its projections." *Hamood v. Arab Cmty. Ctr. for Econ. and Soc. Servs.*, No. 23-cv-10270, 2025 WL 975389, at *5 (E.D. Mich. Mar. 31, 2025) (Parker, J.) (citing *Speer*, 2024 WL 4370773, at *10); *Brown v. MGM Casino*, No. 2:22-cv-12978, 2024 WL 4819575, at *7 (E.D. Mich. Nov. 8, 2024) (Drain, J.). MotorCity maintains that unavailability of

supervisors in Plaintiffs' positions, or the need to replace Plaintiffs in those positions, because of the need to quarantine would add unanticipated payroll costs and overtime costs, especially considering the number of Plaintiffs requesting accommodations. In addition, Plaintiffs' positions were subject to strict occupational licensing requirements imposed by the Gaming Control Board, and so their positions would be difficult to fill. As MotorCity explains in its reply brief, filling Plaintiffs' positions would require a lengthy hiring and licensure process, including screening applicants and requiring successful applicants to submit to licensing requirements with a background check, before the new hire could be onboarded to fill in for a quarantining supervisor. ECF No. 30, PageID.2425. However, the Court cannot determine, based on the record before it, whether these costs would be substantial in relation to MotorCity's overall business, which is what must be shown to demonstrate an undue hardship. Thus the Court cannot grant MotorCity summary judgment on this basis. *See Brown*, 2024 WL 4819575, at *9.

Plaintiffs argue that MotorCity cannot rely on adverse impact caused to other employees, contending that under the Supreme Court's *Groff* decision, "adverse impact on other employees, standing alone, does not satisfy the undue burden test." *See Hayslett v. Tyson Foods, Inc.*, No. 1:22-cv-1123, 2023 WL 11897503, at *13 (W.D. Tenn. Sept. 20, 2023). However, MotorCity does not rely on the impact on other employees *alone*, and courts have held that "[u]ndue hardship refers to more than

just the economic cost of providing an accommodation. Employers may consider intangible costs like the loss of office efficiency and the safety risk an accommodation can pose to other employees." *Speer*, 2024 WL 4370773, at *10. In fact, the Sixth Circuit has stated that "safety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business." *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1975); *Brown*, 2024 WL 4819575, at *9 ("[C]ourts have found that safety risks to other employees, on their own, may constitute an undue hardship.").

Plaintiffs also argue that MotorCity's undue hardship argument fails because its union employees were not required to be vaccinated and MotorCity provided an accommodation to its Executive Chef Michael Golden, which included masking, social distancing, and testing. Plaintiffs argue that those same accommodations could have been offered to Plaintiffs. It is true that courts have found the treatment of other employees who either have been accommodated for or excluded from an employment policy can be relevant to the undue hardship analysis. In fact, in a case closely analogous to this one, *Brown v. MGM Grand Casino*, No. 2:22-cv-12978, 2024 WL 4819575 (E.D. Mich. Nov. 18, 2024) (Drain, J.), the casino defendant's union employees, comprising 80% of its workforce, were exempt from the defendant's COVID-19 vaccine

mandate, just like in this case. *Id.* at *9. In that case, the Honorable Gershwin Drain found that

> Defendant has not demonstrated that Plaintiff remaining unvaccinated would put its other employees or guests at any *meaningful* increased risk for COVID-19 …[because] 80% of its workforce was not subject to the COVID-19 vaccination policy and [] Plaintiff and Bryant Brown were the *only* employees in the Warehouse who were required to be vaccinated.

*Id.* at *9; *see also Cox v. Gray Media Grp.*, Case No. 5:22-CV-00290, 2024 WL 1403074, at *5 (E.D. Ky. Apr. 1, 2024) ("Although an undue hardship analysis does not involve the use of comparators, whether [the employer] accommodated employees with similar job duties is probative to whether [plaintiffs'] requested accommodations imposed an undue burden on [the employer]."), *aff'd*, 2024 WL 2412266 (E.D. Ky. May 23, 2024).

The record here suggests that if Plaintiffs had been allowed to remain unvaccinated, that would not necessarily have subjected other employees or customers to an increased risk of COVID, given that the union workforce was not required to be vaccinated (because MotorCity did not have legal authority to impose the vaccine requirement on them absent negotiation with their union). However, MotorCity has explained that its union employees' job duties differed from those of Plaintiffs, who were all in *supervisory* positions that required special licensing. Union employees were more numerous than nonunion employees and as individual employees were responsible for a smaller area of the casino. If

MotorCity could not find a replacement for a unionized table games dealer (from a much larger pool of employees), it would have to close a single table. But if MotorCity could not find a replacement for a Table Games Supervisor, it would be required to close six tables. MotorCity asserts therefore that accommodating a union employee (if accommodation were required) would impose significantly less costs on MotorCity than accommodating nonunion Plaintiffs.

Further, Plaintiffs are not at all similarly situated to Executive Chef Michael Golden, who in November 2021 was granted an accommodation from the Vaccine Policy due to a medical disability, not because of his religious beliefs. ECF No. 24-61. Mr. Golden's duties as Executive Chef for MotorCity were completed for a large part in his private office and included managing the scheduling of 50 employees who reported to him, and preparing menus and proposals for events, in addition to his duties in the kitchen, such as verifying food quality, taste tests, and food safety. Michael Golden Dep. at 10–11, ECF No. 24-62, PageID.1379. The accommodations granted to Mr. Golden included wearing a mask, except when alone in his office, practicing social distancing, limiting the amount of work performed outside his office, not allowing others into his office, attending meetings via telephone or video conferencing, and COVID-19 testing at his own expense. ECF No. 24-61. Plaintiffs, on the other hand, were generally required to work with the public and other employees on the casino floor, not in private offices, and

could not perform their duties remotely. ECF No. 25-10, PageID.1549–51.

So while the casino's treatment of other employees might be relevant to the question whether allowing similar accommodations to Plaintiffs would cause an undue hardship on MotorCity, "[t]he reasonableness of an employer's attempt at accommodation cannot be determined in a vacuum. Instead it must be determined on a case-by-case basis; what may be a reasonable accommodation for one employee may not be reasonable for another." *Smith*, 827 F.2d at 1085. Ultimately, "[t]he trier of fact is in the best position to weigh these considerations." *Id.* (quoting *Redmond v. GAF Corp.*, 574 F.2d 897, 902–03 (7th Cir. 1978)).

Accordingly, considering the parties' cross-motions for summary judgment, the Court finds that there are fact issues as to whether the consequences of granting Plaintiffs' requested accommodations would result in substantially increased costs to the conduct of MotorCity's business, even without considering the attendance data in Mr. Fuchs' declaration. Because there is a genuine issue of fact to be resolved, the Court must deny MotorCity's motion for summary judgment as to Plaintiffs Dalloo, Duff, Hissom-Galanty, King, Murel, Pollack, Runyon, Safadi, Stokes, Terry, Walker, and Zora. While the Court cannot grant MotorCity summary judgment on the issue of undue hardship, nor can it conclude, as a matter of law, that accommodating Plaintiffs' religious

exemptions would not have caused undue hardship to MotorCity. The Court must therefore likewise deny Plaintiffs' motion for partial summary judgment. "Ultimately, it is the function of the jury to determine the weight it should give to [MotorCity's] assertion that it would have suffered an undue hardship by accommodating Plaintiff[s]." *See Brown*, 2024 WL 4819575, at \*10 (citing *Payne*, 767 F.3d at 530).

## IV.   CONCLUSION

For the reasons set forth above, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment, ECF No. 24, and **GRANTS IN PART and DENIES IN PART** Defendant's Motion for Summary Judgment, ECF No. 25.

Specifically, Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff Ramon Hana, and his claim is **DISMISSED WITH PREJUDICE**.

The parties' cross-motions for summary judgment are otherwise **DENIED** as to the remaining Plaintiffs, Mark Dalloo, Kenneth Duff, Joseph Hissom-Galanty, Rita King, Beatrix Murel, Kevin Pollack, Todd Milo Runyon, Mattia Safadi, Susie Stokes, Denise Terry, Audonte Walker, and Nihad Zora, whose Title VII religious accommodation claims shall proceed.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike the Declaration of Darryl Fuchs, ECF No. 36, is **DENIED**.

**IT IS SO ORDERED.**

Dated: July 28, 2025          /s/Terrence G. Berg
                              HON. TERRENCE G. BERG
                              UNITED STATES DISTRICT JUDGE